**BRUNSWICK CORPORATION,
Plaintiff-Appellant,**

v.

**CHAMPION SPARK PLUG COMPANY,
Defendant-Appellee.**

**No. 81–1957.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1982.

Decided Sept. 28, 1982.

Rehearing and Rehearing En Banc
Denied Nov. 8, 1982.

John M. Calimafde, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for plaintiff-appellant.

Dugald S. McDougall, McDougall, Hersh & Scott, Chicago, Ill., for defendant-appellee.

Before SPRECHER * and CUDAHY, Circuit Judges, and DOYLE,** District Judge.

CUDAHY, Circuit Judge.

In this patent appeal, Brunswick Corporation ("Brunswick") challenges the entry of a directed verdict in favor of defendant Champion Spark Plug Company ("Champion") in a patent infringement suit. The district court, at the close of all the evidence, held Brunswick's claimed patent to be invalid, on grounds of obviousness, under 35 U.S.C. § 103 (1976). We affirm.

* Judge Sprecher heard oral argument and participated in the conference which followed. He died May 15, 1982 and did not participate in the preparation or approval of this opinion.

** The Honorable James E. Doyle, United States District Judge for the Western District of Wisconsin, is sitting by designation.

1. In the so-called "conventional spark plug" (the type used in automobiles), by contrast, the

## FACTS

The patent in suit, No. 3,599,030, was granted on August 10, 1971, to Brunswick, as assignee of Daniel A. Armstrong, its Chief Staff Engineer. That patent, which we shall refer to for brevity as the "030 patent," is entitled "Annular Surface Gap Spark Plug." As the 030 patent explains, an annular surface-gap spark plug is one which has a multidirectional spark gap, consisting of a central electrode and an outer-grounded circular electrode. The outer-grounded electrode surrounds the central electrode on all sides but is entirely insulated from it. The space (or gap) between the inner and outer electrodes is filled with a ceramic or refractory material and the generated spark extends in all directions across the gap between the center and the outer electrodes on the surface of the ceramic.[1]

The annular surface-gap spark plug is commonly used in a two-cycle engine employed in an outboard motor to drive boats. This type of plug is particularly suitable for use in large engines driving boats at high speeds. A two-cycle outboard motor engine is an internal combustion engine that includes the usual piston and piston rod to drive the propeller shaft. The power is produced by igniting, via the spark plug, a highly flammable mixture of gasoline and oil, and thereby producing a controlled explosion which drives the piston and piston rod within the cylinder.[2] In general, a longer spark across a wider gap is more efficient since more "igniting" energy is exposed to the fuel. An optimum gap width may be approximately .050 ($^{50}/_{1000}$ inch), and such a gap dimension has become known as a "wide gap." To generate sufficient electrical energy to cause the spark to traverse a wide gap, a special high voltage ignition system has been developed.

spark gap is formed by a side electrode that extends out over the center electrode.

2. At wide open throttle, the propeller shaft of a two-cycle outboard engine is driven between 4500 and 6000 revolutions per minute (rpm). In the two-cycle engine, a separate ignition is required for each revolution of the shaft, so that when the engine is operating at 6000 rpm, the spark plug is generating 6000 sparks per minute, or 100 sparks per second.

In 1965, the Mercury Marine Division of Brunswick Corporation (or its predecessor) began to commercialize a two-cycle engine which included the high voltage ignition system and an annular surface-gap plug in which the center electrode was made of nickel alloy. During the 1965–66 period, these surface-gap spark plugs, which had spark-gap lengths greater than 0.03 inch, were manufactured for Brunswick by Champion. The Champion surface-gap plugs were identified as type L19V, and were approved by Armstrong, the alleged inventor in this case, as Brunswick's Chief Staff Engineer. Undisputed evidence adduced at trial indicated that Brunswick was well pleased with Champion's L19V spark plug (which Brunswick denominated its "polar-gap plug"). For example, in a 1966 advertisement, Brunswick touted the polar-gap plug as "the first major breakthrough in outboard ignition in 50 years," stressing its increased engine efficiency and reliability, and praising the plug's durability and long life.

In September, 1966, defendant Champion conducted an industry-wide engineering conference on engine ignition which Armstrong attended as a Brunswick representative. At this conference, Armstrong learned something about the properties of tungsten as an electrode material and was informed, by a Champion engineer, that surface-gap spark plugs ran at temperatures in a range of approximately 600°–700° F., that range being characterized as "quite low compared to the insulator tip temperature of a conventional spark plug."[3] Tr. 250. Armstrong was also shown two enlightening charts: The first illustrated the phenomena which cause spark-plug electrodes to deteriorate. The second chart showed the deterioration rates of four different electrode materials—tungsten, inconel (a nickel alloy), platinum and iridium—as a function of electrode temperature. The chart showed that at temperatures up to about 1000 degrees F. the dete-

rioration rate of tungsten was significantly lower than that of any of the other three materials, while at temperatures above 1000 degrees F. the deterioration rate of tungsten was much greater than the others. A paper accompanying the charts explained that tungsten's poor life at elevated temperatures was due to its "susceptibility to oxidation."

In Armstrong's report of the 1966 Champion conference, submitted to Brunswick executive Kiekhaefer, on September 27, 1966, Armstrong wrote:

> Note—after viewing one of their charts of electrode deterioration rate *vs* temperature, it would appear that we should investigate the use of tungsten as a center electrode—it has a very low deterioration rate under 1000 degrees F., and our polar gap plug runs well under this temperature.

Pl. Ex. No. 110; Tr. 255. At trial, Armstrong agreed that the lectures he had heard at the Champion conference in 1966 had "started our investigation into the use of tungsten." Tr. 284–85. Shortly after writing his report to Kiekhaefer, Armstrong asked a Champion sales representative to supply him with surface-gap spark plugs having tungsten center electrodes. Champion, however, did not comply with the request. Although the reasons for Champion's refusal is unclear, there was evidence that Champion had previously made such spark plugs for Chrysler Outboard which were successfully tested but which were not ordered by Chrysler customers in commercial quantities.

In the latter part of 1967, while attending a marine trade show in Chicago, Armstrong met Ronald P. Gilmour, an engineer associated with the AC Spark Plug Division of General Motors Corporation. On that occasion, through Gilmour, Armstrong asked AC for sample surface-gap plugs made with "tungsten material" center electrodes.[4]

---

**3.** The *accuracy* of this information was sharply disputed at trial. However, Brunswick did not contest the *fact* that the statements were made,

nor the fact that Armstrong relied heavily upon them in developing his alleged invention.

**4.** The term "tungsten material" (as opposed to

There was testimony at trial that AC was receptive to Armstrong's request both because it was already working on some developments in tungsten that might make it feasible for this application and because AC was eager to have Brunswick as an outboard motor customer for AC spark plugs.

Approximately one year after his conversation with Gilmour, Armstrong received from AC eight sample spark plugs with center electrodes made of tungsten alloy. Armstrong concededly played no part in the actual development or fabrication of these spark plugs. In fact, Armstrong testified as to the arrival of the spark plugs from AC as follows: "Actually those samples arrived, you know, as a complete surprise to us. We didn't even know they were going to make them." Tr. 258. Once the samples arrived, however, Armstrong promptly put them out on endurance tests in two different six-cylinder outboard engines to compare the plugs with the regular production AC and Champion plugs. After 315 hours, the sample AC tungsten-alloy plugs displayed markedly less electrode erosion than did the comparison plugs having nickel-alloy center electrodes. Within a short period of time, Champion began manufacturing its own tungsten-center plug, and tungsten-alloy came to replace nickel-alloy as a center electrode material throughout the industry, because of its superior endurance and slower erosion rate.

Armstrong filed his application for a patent on July 15, 1969. The spark plug illustrated in the drawings and described in the specification of this patent application was the AC tungsten-alloy plug of which Armstrong had received samples; it was identical to AC's prior-art V40FF plug except for the fact that the center electrode was made of tungsten-alloy rather than nickel-alloy. Since Armstrong had not fabricated the spark plugs himself, it was necessary for him, in order to complete the patent application, to secure analyses from chemical laboratories to determine the precise composition of the tungsten-alloy center electrode.

In its first official action on the 030 application, the Patent Office rejected all of Armstrong's original claims as anticipated by, or obvious over, the prior art. Thereafter, Armstrong cancelled all the original claims and substituted a claim which ultimately became the sole claim of the patent.[5] Together with its amended claim, Armstrong submitted to the Patent Office a lengthy argument urging that the substituted claim be allowed. In that argument, Armstrong stated that, prior to his invention, the outboard industry had been faced with an endurance problem with which prior-art spark plugs could not cope, and informed the Patent Office that:

[T]he inventor in the present application faced this problem and through a logical sequence of analysis *developed* and tested the present invention and achieved very striking results which has [sic] revolutionized the outboard industry. He *realized* that tungsten alloys had good resistance to deterioration at temperatures below 1000 degrees and that *if* the surface gap plug, in fact, operated under that temperature and *if* the available capacitor discharge ignition system could fire a plug operating under that temperature, then *perhaps* a tungsten alloy would be attractive for such a plug to increase its resist-

plain tungsten) is used in the above text to present the facts in the light most favorable to Brunswick, the quoted term having been used by Armstrong in his trial testimony.

5. *The single claim of the patent reads as follows:*

1. An annular gap spark plug for a two-cycle engine having capacitator discharge fast-rise time ignition system with a sufficiently high voltage capacity to fire across a gap exceeding 0.03 inch, said spark plug being constructed to operate at temperatures below 1000 degrees F. and having a refractory body with a central electrode of tungsten alloy confined therein and a circular casing constituting an electrode substantially concentric with the central electrode and providing a circular gap between said electrodes of substantially uniform dimension exceeding 0.03 inch, said central electrode being substantially free of deterioration at temperatures below approximately 1000 degrees F.

ance to corrosion. Such a plug was built and tested and the results were not only positive but were astonishing. . . . Three runs were made with the new spark plug being used in various cylinders. The results are self-explanatory from the picture.

(emphasis supplied).

In the picture referred to in this quotation, the test plugs with tungsten-alloy center electrodes appeared pristine, with no visible electrode erosion. In fact, however, the center electrodes of those plugs did erode, as evidenced by tip "undercutting." Armstrong pointed out this fact in a covering letter he sent, together with the same photograph, to Brunswick executive Kiekhaefer in December 1968, but no similar disclosure concerning the photograph was ever made to the Patent Office. Brunswick's application for a patent was granted on August 10, 1971.

As indicated above, Champion quickly emulated the patented spark plug and began selling it in large quantities; in response, Brunswick commenced this infringement suit on June 14, 1976. Brunswick's complaint sought an injunction against continued infringement by Champion and an accounting for damages. In its Answer, Champion denied infringement, denied the validity of the patent and counterclaimed for a declaratory judgment of invalidity and non-infringement.

The issue of patent validity was tried to a jury between April 27 and May 13, 1981. At the close of Brunswick's evidence, Champion moved for a directed verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court reserved ruling until the close of all the evidence. At the close of all the evidence, the district court, in an oral opinion, granted defendant's motion for a directed verdict. The court stated, *inter alia,* that

the Seventh Circuit has held that after a preliminary factual determination is made on the scope and content of the prior art and the difference between the

prior art and the claims at issue, then the trial judge determines as a matter of law whether the alleged invention or discovery would have been obvious at the time of the invention to a person having ordinary skill in the prior art—in the art.

Tr. 810.

The district court conceded that if one looked "purely at the commercial success of the invention or the alleged invention, then [one] would have to say that it was indeed an invention." *Id.* But the court went on to hold:

I think this would have been obvious to anyone looking at the same items that Mr. Armstrong looked at to anyone skilled in the art, and, therefore, I am going to rule that on the question of obviousness this was very obvious.

I have never been more convinced in any case that I ever tried—I have tried a number of patent cases—that the invention and the question—the patent in question, I should say, was obvious.

*Id.* 820–21.

The district court subsequently entered a detailed Memorandum and Order dated June 3, 1981. In that Memorandum, the district court held that Armstrong's alleged invention would have been obvious at the time it was made to a person having ordinary skill in the art of spark plug design. Specifically the district court stated:

The record shows that there is no significant difference between the prior art and the single patent claim at issue, the patented plug being identical to the prior-art V40FF spark plugs save for the substitution of one conventional, well-known electrode material for another. Again, viewed from another aspect, the record shows that there is no significant difference between the patented plug and the prior-art tungsten-alloy spark plugs designed for outboard motors, the structures of the prior-art plugs and the patented plug being alike save for differences in spark-gap length, the selection of

which has long been a routine engineering matter within the skill of the art. Memorandum Opinion at 15.[6]

In addition to holding the challenged patent invalid for obviousness, the district court also found that the plaintiff had failed to fulfill its duty to fully and accurately disclose to the Patent Office all relevant facts, including:

(a) [that] the spark plug on which plaintiff sought a patent was identical to a prior art commercial AC plug but for the substitution of a tungsten-alloy center electrode for the nickel-alloy center electrode previously used; (b) [that] the actual design in construction of the spark plug ... was carried out by AC employees without any liaison with, or supervision from the alleged inventor, Daniel A. Armstrong; (c) [that] Armstrong's only contribution to the patented plug was to suggest a tungsten center electrode [Armstrong having learned the composition of the patented plug's electrode only from a chemical analysis conducted by a laboratory]; and (d) [that] Armstrong's suggestion that the sample plugs be made with tungsten center electrodes was inspired by technical information acquired by Armstrong from defendant Champion, at a technical conference to which Armstrong was an invited guest.

Memorandum Opinion at 17. The district court declined to decide whether plaintiff's misconduct before the Patent Office constituted "a separate and independent ground" for adjudging the patent in suit invalid, but held that plaintiff's breaches of duty were sufficient to deprive the patent of its statutory presumption of validity. *Id.* at 18.

6. The district court found that the level of ordinary skill in the art of designing spark plugs was "that of an intelligent and resourceful graduate engineer with several years of practical experience." Memorandum Opinion at 15.

7. Brunswick argues that the district court, in its oral opinion, used an erroneous legal standard—the synergism test rejected by this court in *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963, 967 72 (7th Cir. 1979)—to determine the obviousness of the challenged patent. In support of this contention, Brunswick relies on the following statement made by the district judge near the close of his oral opinion:

## DISCUSSION

It is evident, from both the district court's oral and written opinions, that the court directed a verdict in favor of Champion on the issue of obviousness. It is also evident that the district court found the facts surrounding the three inquiries spelled out in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966), to be undisputed and, therefore, that these "undisputed facts" formed the basis for its directed verdict. *See* Memorandum Opinion at 50–53.[7] In *Graham v. John Deere,* the Supreme Court held that while the ultimate issue of patent validity is one of law, the question of obviousness lends itself to several basic factual inquiries:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

383 U.S. at 17, 86 S.Ct. at 694. This circuit, however, has squarely held that if these subsidiary determinations can be made on the basis of undisputed facts, then no factual issues need be submitted to the jury, and obviousness becomes a matter of law for the district court. *Dual Mfg. & Engineering, Inc. v. Burris Industries, Inc.,* 619 F.2d 660, 663–64 (7th Cir.) (en banc), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); *Beatrice Foods Co. v. Tsuyama Mfg. Co.,* 619 F.2d 3, 5 (7th Cir. 1979). We

I think that the—this is simply an arrangement of old elements, each performing the same function it had been known to perform, and although it did produce and may have produced a more striking result than previously was indicated, I don't think that makes any difference....

Tr. 821. A careful reading of both the district court's oral and written opinions, however, demonstrated that this statement did not form the significant basis for the district court's directed verdict and that, in evaluating the issue of obviousness, the district court correctly applied the three-part test set forth in *John Deere.*

therefore turn to an examination of each of the *John Deere* factors to determine whether the presence of a disputed issue of material fact renders the district court's grant of a directed verdict improper. *See Schutt Mfg. Co. v. Riddell, Inc.,* 673 F.2d 202 (7th Cir. 1982) (similar inquiry employed on appeal from grant of summary judgment).

### A. The Scope and Content of the Prior Art

As the district court correctly noted, the most relevant prior art is the AC V40FF commercial spark plug, which was identical in all respects to the patented plug except for the material of which its central electrode was made. Although Brunswick never explicitly brought the V40FF plug to the attention of the Patent Office, Brunswick did note, in its patent application, that the prior art included wide-gap annular spark plugs, fired by a high voltage ignition system. Further, Brunswick does not contest the structural similarity between the AC40FF plug and Armstrong's alleged invention. Other prior art, which both parties agree is relevant to the first *John Deere* inquiry, includes the following:

*Hensel patent No.* 2,391,455 (1945): This patent disclosed a conventional L-shaped side electrode spark plug having center electrodes made of tungsten or tungsten alloy. The patent also mentioned that when tungsten exceeds a certain temperature it tends to overheat, oxidize and wear away rapidly.

*Peras patent No.* 2,908,569 (1959): This patent disclosed a surface-gap spark plug having a narrow gap, but a center electrode made of tungsten. Peras' application indicated that the patented plug had been tested at low voltage in an internal combustion engine. This type of plug was also tested by Champion, in an experimental program,

during the years 1957 to 1965, but was never commercialized.[8] The Peras patent was also brought to the examiner's attention by Armstrong's counsel because it disclosed tungsten and tungsten alloy as equivalent alternative materials. Tr. 534–37, 544.

*Suter patent No.* 2,910,606 (1959): This patent shows a low-voltage, surface-gap spark plug, having a narrow gap and a center electrode made of tungsten alloy. Suter also discloses the use of glass between the two electrodes. The Suter patent was not cited by or brought to the attention of the patent examiner, but, for purposes of this appeal, we accept Brunswick's contention that its showing was substantially equivalent to Peras' 569 which was cited.

*Aircraft Igniters:* These igniters, sold by Champion and General Motors for use in jet aircraft engines, were structurally identical to the patented plug and used tungsten alloy as the center electrode. The igniters, however, were placed in an environment and fired by an ignition system substantially different from that found in a two-cycle marine outboard engine.

*Segall patent No.* 2,860,273 (1958): Segall discloses a wide gap annular spark plug having a center electrode and an annular gap within the range of .003 inch to .050 inch. The composition of the center electrode is not specified. Although the drawings submitted by Segall depict his plug employed as an igniter in a jet or turbine engine, the patent application explicitly states that "the drawings are for the purpose of illustration only and are not intended as a definition of the limits of the invention." Segall was cited by the examiner but was not mentioned in Armstrong's patent application.

---

8. Brunswick contends, on appeal, that it was erroneous for the district court to include, as part of the relevant prior art, the low voltage surface-gap spark plugs developed by Champion in this experimental program. Brunswick argues that because Champion's experimental program did not result in commercialization of the tested plugs, the plugs must be considered abandoned within the meaning of 35 U.S.C. § 102(g) (1976), and cannot be viewed as part of the relevant prior art. However, in light of Brunswick's admission that Champion's experimental plugs "were essentially the same as the low voltage, surface-gap plugs discussed previously in connection with [the] Peras and Suter [patents]," Brunswick Br. at 29, their consideration by the district court was, at worst, harmless error.

*Minks patent No. 3,395,686 (1968)*: The Minks patent, which was identified by Armstrong and cited by the examiner, discloses the capacitor discharge (CD) ignition system—the high tension system mentioned in the Armstrong patent.

Because both Brunswick and Champion agree on the content and essential relevance of each of the above discussed items, there is no disputed issue of material fact as to the state of the prior art.

### B. The Differences Between the Prior Art and the Patent in Issue

■ As mentioned earlier, Armstrong's alleged invention differs from the AC V40FF commercial spark plug only with respect to the composition of its center electrode. Moreover, an examination of the undisputed prior art indicates that the use of both tungsten and tungsten alloy as a center electrode material in conventional side gap spark plugs and in annular surface-gap plugs adapted for use in low voltage internal combustion engines was well known prior to Armstrong's alleged invention. Similarly, the prior art reveals that annular surface-gap plugs having the same structure and center electrode composition as Armstrong's invention had been used as igniters in aircraft and turbine engines for many years. Thus, as Brunswick itself has argued, Armstrong's patent differs from the prior art primarily in its environmental and functional aspects, in that it discloses, allegedly for the first time, "a surface gap plug having a wide gap and a center electrode of tungsten alloy, *fired by a high voltage, fast-rise time, CD ignition system, for use in a two-cycle engine.*" Brunswick Br. at 20 (emphasis supplied).

There is thus no material issue of fact as to the difference between the prior art and the patent in issue. Whether the undisputed differences between these two items are sufficiently significant as to be unobvious to one of ordinary skill in the art is, of course, a legal determination properly made by the district court, and fully reviewable on appeal. *Pate Co. v. RPS Corp.*, 685 F.2d 1019 (7th Cir. 1982); *Dual Mfg. & Engineering, Inc. v. Burris Industries, Inc.*, 619 F.2d 660, 663–64 (7th Cir.) (en banc), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); *cf. Harvestall Industries, Inc. v. Hochstetler*, 656 F.2d 1232, 1234–35 (7th Cir. 1981) (summary judgment appropriate in patent cases where there are no material issues of fact and where structure and mode of operation of accused device can be easily comprehended).

### C. The Level of Ordinary Skill in the Art

■ The third inquiry mandated by the *John Deere* court is the level of ordinary skill in the pertinent art. The district court in the instant case specifically found that "[t]he level of ordinary skill in the art of designing spark plugs is that of an intelligent and resourceful graduate engineer with several years of practical experience." Memorandum Opinion at 15. Neither party challenges this finding. There is thus no disputed issue of fact regarding this aspect of the *John Deere* test.

### D. The District Court's Determination of Obviousness

■ Based on these undisputed facts, the district court properly undertook to determine whether Armstrong's alleged invention would have been obvious at the time it was made to a person of ordinary skill in the art.[9] *See Dual, supra* at 663–64. Brunswick challenges the district court's conclusion of obviousness on several grounds. First, Brunswick contends that the evidence at trial, both testimonial and documentary, was sufficient for a jury to conclude that a person skilled in the art of spark plug design would have been deterred from using tungsten or its alloy as a center

---

9. We agree with the district court that plaintiff's lack of candor before the patent office was sufficient to deprive the patent in suit of its statutory presumption of validity. *See Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963, 973–74 (7th Cir. 1979), cited and followed in *Dual Mfg. & Engineering, Inc. v. Burris Industries, Inc.*, 619 F.2d 660, 665 (7th Cir. 1980) (en banc).

electrode material.[10] Brunswick argues strongly that where, as here, the prior art or prevailing technical thinking "teaches away" from the patented solution, the solution can hardly be deemed obvious. *See Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763, 766 n.1 (5th Cir.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). In support of its "teaching away" theory, Brunswick relies heavily on *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), a patent infringement suit decided by the Supreme Court the same day as *Graham v. John Deere.* Brunswick's reliance on *Adams,* however, is misplaced. At issue in *Adams* was a patent on a nonrechargeable water-activated battery comprising two electrodes—one made of magnesium, the other of cuprous chloride. The Supreme Court described the resulting invention as "the first practical, water-activated, constant potential battery which could be fabricated and stored indefinitely without any fluid in its cells." 383 U.S. at 43, 86 S.Ct. at 710. The government, as the alleged infringer in *Adams,* argued that because wet batteries comprising a zinc electrode and a silver chloride electrode were disclosed by the prior art, and because the prior art showed that, in general, magnesium could be substituted for zinc and cuprous chloride for silver chloride, the "combination of magnesium and cuprous chloride in the Adams battery was not patentable." 383 U.S. at 48, 86 S.Ct. at 713.

The Supreme Court rejected the government's argument, primarily because most of the prior art batteries relied upon by the government were of a completely different type than the Adams invention, and secondarily, because Adams' battery had shown valuable and wholly unexpected operating advantages over those batteries from which it was claimed to have been copied. 383 U.S. at 50–51, 86 S.Ct. at 713–714. The Court also noted that despite the fact that each of the individual elements in the Adams battery was well known in the prior art, to think of combining them, as Adams had, required that a skilled person disregard several long accepted principles in the art of battery design. In acknowledging that disadvantages in old devices which would naturally discourage the search for new inventions "may be taken into account in determining obviousness," 383 U.S. at 52, 86 S.Ct. at 715, the Supreme Court was careful to emphasize that it was *not* suggesting "that one who merely finds new uses for old inventions by shutting his eyes to their prior disadvantages thereby discovers a patentable innovation." *Id.*

Although we acknowledge that prevailing notions within the industry regarding spark plug conditions and temperatures may have "taught away" from Armstrong's alleged invention, we agree with the district court that such "teaching away," when considered in light of the entire body of prior art and the differences between the prior art and the patent in issue, is insufficient to render the invention unobvious to one of ordinary skill in the art. Moreover, as a policy matter, we believe it may be inconsistent with the goals of the

---

**10.** This evidence allegedly consisted of knowledge on the part of Champion that the surface-gap spark plug, tested in a relatively low power (35 hp) engine operated at an average temperature of between 950 1150 degrees F.; that these temperatures are close to or in the destructive range for tungsten of approximately 1000 degrees F.; that the instantaneous temperatures in the combustion chamber of a low horsepower outboard engine are 40,000 degrees F. spark temperature and 5000 degrees F. fireball temperature; that higher horsepower engines would operate at even higher average temperatures; that Champion had known of the tungsten-alloy for many years in its igniters and experimental low voltage, surface-gap plugs; that Champion refused, even on an experimental basis to make a high voltage, surface-gap spark plug with a tungsten center electrode when Armstrong requested it; and that Champion had experimented with using gold, platinum, and other exotic metals as center electrode materials, but not with tungsten.

Champion strongly disputed both the accuracy and the relevance of much of this evidence. For purposes of evaluating the propriety of the directed verdict in this case, we must accept Brunswick's factual allegations as accurate, *Oberlin v. Marlin American Corp.,* 596 F.2d 1322, 1326 (7th Cir. 1979), although we remain free to determine, for ourselves, their legal relevance.

patent monopoly to allow plaintiff's "teaching away" theory to defeat a claim of obviousness in the instant case. There is no suggestion in the record that Armstrong was aware of any of the purported obstacles standing in the way of his "invention," nor that he was privy to any of the prevailing technical wisdom which "taught away" from the use of tungsten as a center electrode material in high voltage surface-gap plugs. Thus, to the degree that any industry-wide skepticism existed, Armstrong was able to penetrate it *not* because of his superior insight or persistence, but because of his ignorance and naivete—presumably not qualities which the patent monopoly is specifically designed to reward.[11]

■ Brunswick's contention that the district court erred in not permitting the jury to consider whether a person skilled in the art could have been discouraged from using tungsten as a center electrode material is similarly without merit. As this court recently reiterated in *Medical Laboratories Automation, Inc. v. Labcon, Inc.,* 670 F.2d 671 (7th Cir. 1981),

> if the differences between the patent in suit and the prior art are such that the subject matter as a whole is obvious to a lay [person], a determination of the level of skill on the basis of expert testimony in the pertinent art would be useless.

670 F.2d at 674 (quoting *Lee Blacksmith, Inc. v. Lindsay Bros., Inc.,* 605 F.2d 341, 344 (7th Cir. 1979); *accord Schutt Mfg. Co. v. Riddell, Inc.,* 673 F.2d 202, 205–06 (7th Cir. 1982). Similarly, this court recently held, in *Harvestall Industries, Inc. v. Hochstetler,* 656 F.2d 1232, 1235–36 (7th Cir. 1981), that where the design of a patent is not particularly sophisticated or different from the prior art, a district court is capable of evaluating, on its own, "the nature and the teachings of the prior art," and of determining the relevance of particular items to the patent in suit.

■ We do not dispute Brunswick's contention that the tungsten-alloy center spark plug which is the subject of this suit is superior in performance to Champion's earlier nickel-alloy center plug. Superiority and nonobviousness, however, are not synonymous, although superiority may in some instances be evidence of invention. *In re Hoffmann,* 556 F.2d 539, 541 (CCPA 1977). Making something that is merely stronger or longer lasting than the prior art is not the sort of innovation for which the patent monopoly is granted. *St. Regis Paper Co. v. Bemis Co.,* 549 F.2d 833, 839 (7th Cir.), *cert. denied,* 434 U.S. 833, 98 S.Ct. 119, 54 L.Ed.2d 94 (1977). It is well established, moreover, that a mere change in material (here nickel-alloy to tungsten-alloy) cannot give rise to a patentable invention if the properties of the materials are already known and the result obtained was the one to be expected. *Sinclair & Carroll Co. v. Interchemical Corp.,* 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945); *Graham v. John Deere Co.,* 383 U.S. 1, 10, 86 S.Ct. 684, 690, 15 L.Ed.2d 545 (1966). Similarly, the mere substitution of one—albeit superior—material for another in an existing product or structure is ordinarily deemed to be obvious. *Centsable Products Inc. v. Lemelson,* 591 F.2d 400 (7th Cir.), *cert. denied,* 440 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1980). As the Supreme Court has noted,

> reading a list and selecting a known compound to meet known requirements is no more ingenious than selecting the last piece to put in the last opening of a jigsaw puzzle. It is not invention.

*Sinclair & Carroll Co. v. Interchemical Corp.,* 325 U.S. 327, 335, 65 S.Ct. 1143, 1147, 89 L.Ed. 1644 (1945).

In attacking the district court's conclusion of obviousness, Brunswick also relies on *Tracor, Inc. v. Hewlett-Packard Co.,* 519 F.2d 1288 (7th Cir. 1975), in which this court upheld the validity of a patent pertaining to the use of the radioactive isotope nickel-63

---

11. We recognize that modern standards for judging the obviousness of a claimed invention are designed to focus on objective rather than subjective factors. We believe, however, that there are no iron laws here. Thus, it may not be inappropriate, strictly for the purpose of evaluating the persuasiveness of plaintiff's "teaching away" theory here, to give some consideration to Armstrong's particular knowledge and awareness.

as a substitute for the beta producing material, tritium, as a radiation source in an electron capture device. In affirming the district court's determination of nonobviousness in *Tracor,* this court relied heavily on findings of fact by the district court that no one had precisely defined the nature of the radioactive isotope which was being sought, and that the high temperature capabilities and increased sensitivity realized by the use of nickel-63 were both surprising and unexpected. In the instant case, by contrast, no such esoteric material having surprising and unexpected properties is involved. Hence, we conclude that the reasoning of *Sinclair* and *Centsable Products,* rather than the exception to that reasoning expressed in *Tracor,* controls.

■ We also reject Brunswick's contention that the district court, in evaluating the obviousness of Armstrong's claimed invention, gave undue weight to the prior use of tungsten as a center electrode material in low voltage surface-gap spark plugs of the type patented by Peras and Suter, and tested by Champion during the early 1960's. Brunswick has shown no scientific basis for drawing a distinction between low-voltage and high-voltage spark plugs, so far as the use of tungsten-alloy electrodes is concerned; nor does the record contain any basis for such a distinction. Moreover, as noted earlier, the record discloses that for decades prior to Armstrong's alleged invention, both tungsten and tungsten-alloys were used as center electrode material in aircraft igniter plugs which, while intended for a different application, were structurally identical to Armstrong's patented plug.[12] Thus, Armstrong's 030 patent represents, at best, a monopoly over an old article placed in a new environment and fired by a "basically different ignition system." Brunswick Br. at 23. But it is axiomatic in patent law that an old article cannot be repatented on the basis of a newly discovered use. *General Electric Co. v. Jewel In-*

candescent *Lamp Co.,* 326 U.S. 242, 247–49, 66 S.Ct. 81, 83–84, 90 L.Ed. 43 (1945); *Ansonia Brass & Copper Co. v. Electrical Supply Co.,* 144 U.S. 11, 12 S.Ct. 601, 36 L.Ed. 327 (1892). Nor may patentability rest upon "the discovery of a new use or a previously unnoticed advantage of an old structural element." *Scholl, Inc. v. S. S. Kresge Co.,* 580 F.2d 244, 247 (7th Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1021, 59 L.Ed.2d 74 (1979).

■ Brunswick also argues that the district court erred in not considering as strong evidence of unobviousness the existence of a serious erosion problem in the spark plug industry, the unsuccessful efforts of engineers other than Armstrong to solve that problem and the commercial success of Armstrong's alleged invention. Although this court has, on occasion, suggested that such non-technological factors as commercial success or the satisfaction of a long-felt industry need may provide evidence of nonobviousness, *L. E. Sauer Machine Co. v. Corrugated Finishing Products, Inc.,* 642 F.2d 203, 206–07 (7th Cir. 1981), we have also emphasized that these factors constitute secondary considerations that are significant only in close cases, where "unobviousness" is in doubt:

> Only in a close case, in which application of the *primary criteria of nonobviousness* under section 103 does not produce a firm conclusion can these considerations be used to 'tip the scales in favor of patentability.'

*Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963, 975–76 (7th Cir. 1979), *quoting Penduit Corp. v. Burndy Corp.,* 517 F.2d 535, 541 (7th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). *Accord Novo Industri A/S v. Travenol Laboratories, Inc.,* 677 F.2d 1202, 1209 (7th Cir. 1982); *Lee Blacksmith, Inc. v. Lindsay Bros., Inc.,* 605 F.2d 341, 345 (7th Cir. 1979).[13] Because this is not such a "close

---

12. The district court specifically found that "the record shows that there was no structural difference at all between the tungsten-alloy aircraft plugs of the prior art, and the plug defined

in the claim of the patent in suit." Memorandum Opinion at 15.

13. Similarly, the Supreme Court has noted that the fact that a new product "filled a long felt

case," the district court did not err in failing to conclude that plaintiff's allegations of industry need and commercial success "tipped the scales" in favor of patentability.

 Finally, we reject Brunswick's contention that the directed verdict in this case was improper because of the many factual disputes contained in the record. The mere existence of disputed questions of fact does not preclude a directed verdict; rather, a verdict should still be directed if the *undisputed facts* demonstrate, as a matter of law, that the patent in suit is invalid. *See Medical Laboratory Automation, Inc. v. Labcon, Inc.,* 670 F.2d 671, 672–73 (7th Cir. 1981); *Harvestall Industries, Inc. v. Hochstetler,* 656 F.2d 1232 (7th Cir. 1981). Precisely this rule was applied in *Dual Mfg. & Engineering, Inc. v. Burris Industries, Inc.,* 619 F.2d 660 (7th Cir.) (en banc), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), in which this court, sitting en banc, overturned a jury verdict of patent infringement because the undisputed evidence showed, as a matter of law, that the alleged inventions in suit were obvious.[14] 619 F.2d at 667. The same analysis was employed in *Pederson v. Stewart-Warner Corp.,* 536 F.2d 1179 (7th Cir.), *cert. denied,* 429 U.S. 985, 97 S.Ct. 505, 50 L.Ed.2d 597 (1976), where, in affirming a judgment n. o. v., on grounds of obviousness, for the alleged infringer, this court stated that "[b]ecause obviousness is a question of law ... the District Court in this case was therefore not bound to accept expert testimony offered by plaintiff as to what would not have been obvious to one with ordinary skill in the art." 536 F.2d at 1180–81. For these same reasons, Brunswick's contention that the district court's directed verdict impermissibly infringed upon its constitutional right to a jury trial

is without merit. Where the undisputed facts demonstrate that one party is entitled to judgment as a matter of law, directing a verdict in favor of that party is entirely proper. *Gunning v. Colley,* 281 U.S. 90, 93–94, 50 S.Ct. 231, 232–233, 74 L.Ed. 720 (1930).

## CONCLUSION

For the reasons discussed above, we hold that the district court did not err in directing a verdict in favor of defendant Champion on the ground that Brunswick's claimed patent was obvious as a matter of law under 35 U.S.C. § 103 (1976). The judgment of the district court is therefore

AFFIRMED.

---

want and enjoyed commercial success" will not, "without invention [ ] make patentability." *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969). *See also Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976).

**14.** In *Dual,* the Court noted that where disputed issues of fact do exist as to the subsidiary

*John Deere* inquiries, the jury's resolution of those factual issues should ordinarily be articulated in special verdicts under Federal Rule of Civil Procedure 49(a), 619 F.2d at 667. In the instant case, however, no material disputes of fact existed; the use of special verdicts, as requested by Brunswick, was, therefore, not appropriate.