**DICKEY–JOHN CORPORATION,**
Plaintiff-Appellee,
Cross-Appellant,

v.

**INTERNATIONAL TAPETRONICS CORPORATION and Field Electronics, Inc.,**
**Defendants-Appellants, Cross-Appellees.**

Nos. 81–2022, 81–2085.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1983.

Decided June 9, 1983.

As Amended June 14, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1983.

Before ESCHBACH, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and SHADUR, District Judge.[*]

ESCHBACH, Circuit Judge.

The parties cross-appeal from the district court's judgment in this patent infringement suit. In No. 81–2085, plaintiff Dickey-john Corporation, the assignee of the three patents in suit—United States Patent No. 3,537,091 (Schenkenberg '091), United States Patent No. 3,723,989 (Fathauer '989), and United States Patent No. 3,928,751 (Fathauer '751)—appeals the district court's judgment declaring claims, 3, 4, and 6 of the Fathauer '989 patent and claims 1, 2, and 7 of the Fathauer '751 patent invalid. In No. 81–2022, defendants International Tapetronics Corporation and Field Electronics, Inc. appeal the district court's judgment declaring valid, in part, the Schenkenberg '091 patent and holding that defendants willfully and wantonly infringed on that patent. We note jurisdiction under 28 U.S.C. § 1292(a)(4),[1] and for the reasons which follow, we affirm in part and reverse in part.

### Background

Uniform and unbroken rows of crops, disappearing into the horizon, are a familiar sight in this circuit, which encompasses the heart of the cornbelt of our nation. During the planting season another familiar sight is the farmer on his tractor pulling a complex-looking contraption, relentlessly racing against the sun and the weather to sow his seeds into acre after acre of rich, black earth.

Farmers, like everyone else, would prefer not to have to cover the same ground twice.

John K. Lucas, Chicago, Ill., for defendants-appellants, cross-appellees.

Raoford A. Blackstone, Jr., Chicago, Ill., for plaintiff-appellee, cross-appellant.

[*] The Honorable Milton I. Shadur, District Judge for the Northern District of Illinois, sitting by designation.

1. After the appeals in this case were filed, subsection (a)(4) of § 1292, which provided for appellate jurisdiction over judgments "in civil actions for patent infringement which are final except for accounting," was repealed by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 125(a)(3), 96 Stat. 36. Our jurisdiction over the instant case, however,

is not affected by that development. While appellate jurisdiction over appeals from judgments in patent infringement actions which are final except for an accounting now lies in the United States Court of Appeals for the Federal Circuit, 28 U.S.C. § 1292(c)(2), we retain jurisdiction over such cases in which a notice of appeal was filed before October 1, 1982, see Pub.L. No. 97–164, §§ 402, 403(e), 96 Stat. 57, 58. The notices of appeal in this case were filed before that date.

For many years, however, they were forced to do just that when their planters would malfunction and fail to dispense seeds properly. In order to discover such a malfunction,[1] farmers would occasionally have to stop their tractors and make spot checks to assure that seeds were in fact being dispensed; temporary malfunctions not discovered by spot checks would result in gaps in the rows.

Robert Dickey was one such farmer in the 1960's. He believed there was money to be made in developing and marketing a device which would monitor the dispensing of seed and alert the farmer when a malfunction occurred. He consulted an engineering firm regarding the matter, and the firm developed a planter monitor which employed a mechanical switch to be inserted into the planter seed chute, and obtained a patent on the device. Dickey, along with an associate, John Littlejohn, formed the Dickey-john Corporation in 1966 for the purpose of marketing this device and Dickey-john was assigned the patent on it.

The mechanism looked fine on the drawing board, but in the field it proved unreliable. Among the reasons for the uneven performance of the mechanical monitor were the hostile environmental conditions under which it had to perform. Aside from the dirt, dust, and moisture from the ground, the sensitive mechanism had to contend with a variety of substances normally mixed in with the seeds during planting, including herbicides, insecticides, and graphite. The mechanical monitor was adjudged worthless by the verdict of the marketplace: Dickey-john was near bankruptcy, and while tinkering with the monitor yielded some improvement, by 1968 it was unable to interest the major planter manufacturers in the product.

Just when things looked their bleakest for Dickey-john, George Fathauer, an engineer, approached the company in 1969 and demonstrated a prototype of a planter monitor which he had developed. Rather than employing a mechanical switch, Fathauer's monitor used a photoelectric cell for detecting the seeds as they fell through the chute.

Dickey-john purchased the patent rights to the device and began marketing the device; a patent application was filed February 12, 1970. On March 27, 1973, the Fathauer monitor was granted United States Patent No. 3,723,989 (Fathauer '989).

The Fathauer '989 patent in suit, however, was not the first patent on a seed planter monitor using a photoelectric cell. At the time the Fathauer '989 patent application was filed, another patent application for such a system was pending before the Patent Office. Dickey-john purchased the patent on that system shortly after it learned of the patent's issuance. With the acquisition of that patent, United States Patent No. 3,537,091 (Schenkenberg '091), issued October 27, 1970, Dickey-john owned the only two patents granted for photoelectric seed planter monitors.

Fathauer continued work on planter monitors, particularly with respect to the mode of displaying information about the rate of seed dispersal. This work became embodied in United States Patent No. 3,928,751 (Fathauer '751), issued December 23, 1975, which was also assigned to Dickey-john.

Dickey-john prospered by marketing the devices covered by the three patents in suit. Gross sales figures on the monitors increased from $280,000 in 1970 to $12,000,000 in 1979.

International Tapetronics Corporation manufactures taperecording and broadcast equipment. In 1978, the company decided to enter the planter monitor field. In creating a prototype monitor, a Dickey-john monitor was taken apart with the help of a new employee who had previously worked for Dickey-john. When Dickey-john learned of International Tapetronic's plans to market its planter monitor, Dickey-john's attorney sent the company a notice of infringement letter in July 1978. Within two weeks after receipt of the letter, International Tapetronics created Field Electronics, Inc., a wholly owned subsidiary with minimal capitalization, which then proceeded with manufacturing the monitors. In a conclusory opinion of counsel letter dated two days before the date of Field Electron-

ic's first invoice for a planter monitor sale, defendants' counsel expressed the opinion that defendants' devices did not infringe on any valid claim of Dickey-john's planter monitor patents.

### Proceedings Below

Dickey-john commenced this action for patent infringement in the United States District Court for the Central District of Illinois on September 5, 1979, alleging that defendants had willfully and wantonly infringed on several claims of the Schenkenberg '091 patent, the Fathauer '989 patent, and the Fathauer '751 patent. In a bench trial conducted in 1981, defendants asserted the invalidity of the three patents in suit on the ground of obviousness under 35 U.S.C. § 103. Defendants essentially conceded infringement, but contested that the infringement was willful and wanton.

The district court held that the basic claim of the Schenkenberg '091 patent—the use of a photoelectric cell for monitoring seeds in a field planter—was valid and willfully and wantonly infringed by defendants, though it held the claimed use of auxiliary chutes invalid for obviousness based on its comparison of that claim with prior art. This latter holding is not an issue in this appeal; defendants appeal from the former holdings. The district court also held that the claims in issue regarding the Fathauer '989 patent and the Fathauer '751 patent were invalid on obviousness grounds. Plaintiff appeals from these holdings.

The district court reached its conclusions regarding the validity of the claims in issue in the analytical framework set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). It determined that the pertinent prior art regarding the claims in issue consists of "prior planter monitors and basic electronic components and circuit elements known to electrical engineers." Dist.Ct.Op. at 5. Neither party disputes the district court's finding that both the planter monitor art and the electronics art are relevant to the

obviousness inquiry. The court also found the level of ordinary skill in the planter art to be relatively unsophisticated, while the level of ordinary skill in the electronics art to be sophisticated. The court carefully examined the prior art that was cited in the prosecution of each of the patents in issue. Defendants cited prior art not considered by the Patent Office concerning the Schenkenberg '091 patent, arguing that the uncited art rebutted the presumption of validity of that patent. The district court rejected that argument, holding that the uncited prior art was equivalent to the prior art before the Patent Office and hence the Schenkenberg '091 patent was entitled to a presumption of validity. Comparing the disclosures of the Schenkenberg '091 patent with prior art cited by the Patent Office, the court concluded that the "use of a photocell to detect flowing seeds in an agricultural planter would not have been obvious to one reasonably skilled in the art. In fact, anyone who had knowledge of the environment in which the photocell would operate, *i.e.* dust, graphite, moisture, would indeed be discouraged from employing a photocell to count seeds." *Id.* at 11, 86 S.Ct. at 690.

In upholding the validity of the patent, the district court also held that "secondary considerations confirm the nonobviousness of this invention." *Id.* It found beyond dispute that "there was a long-felt but unsolved need for an accurate, reliable seed planter monitor," and that the commercial success of the patented monitor was "impressive," further finding that the "phenomenal commercial success" of the monitor was due to the long-felt and unsolved need rather than skilled advertising and promotion.[2] *Id.*

The Fathauer '989 claims in issue concern the use of a preamplifier and audible alarm system in connection with the basic photoelectric cell. Based upon cited prior art, the court concluded that the use of the preamplifier to counter electronic ignition interference was obvious; based upon both cited

---

**2.** The finding regarding the possible effect of advertising was stated in the negative; we state it in the affirmative for purposes of clarity.

and uncited prior art, the district court concluded that the audible alarm system was obvious, though it did not expressly hold that the uncited prior art was nonequivalent to the prior art.

The Fathauer '751 claims in issue disclose a system of automatically counting the seeds as they are being dispensed and providing the operator with a digital readout of the seed population per unit of area. The district court held that these claims were obvious in light of cited and uncited prior art.

With respect to infringement, the court noted that defendants practically conceded infringement, and went on to hold that defendants' actions constituted willful and wanton infringement entitling plaintiff to treble damages under 35 U.S.C. § 284. It found several factors highly probative in this regard: the copying of the Dickey-john monitor with the help of a former Dickey-john employee; the formation of the minimally capitalized wholly-owned subsidiary and the timing of its formation; and the absence of an opinion of counsel predating the manufacture of the infringing devices. The court left the matter of relief[3] to a second trial, a trial which has been stayed pending the disposition of this appeal.

### Arguments on Appeal

Dickey-john argues in No. 81-2085 that International Tapetronics failed to overcome the presumption of validity of the Fathauer '989 and Fathauer '751 claims in issue, contending that the district court read the teachings of prior art too broadly and slipped into hindsight in concluding that these claims were invalid as obvious. International Tapetronics argues that none of the claims is entitled to a presumption of correctness in view of nonequivalent prior art not cited by the Patent Office and that in any event the claims are obvious even on the basis of a comparison of the cited prior art and the disclosures of the claims at issue.

International Tapetronics argues in No. 81-2022 that the district court's holding that the uncited references were equivalent to the prior art before the Patent Office is clearly erroneous and hence that it erred in according the Schenkenberg '091 claims in issue on this appeal a presumption of validity. It argues that the Schenkenberg '091 claims are obvious in light of the uncited prior art, arguing that the district court erred in considering only the level of skill in the planter monitor art when considering the validity of these claims. Regarding the willful and wanton infringement holding, International Tapetronics argues that the district court accorded undue significance to the creation of the minimally capitalized subsidiary for the marketing of the infringing devices by pointing to the fact that no effort has been made in this litigation to dismiss International Tapetronics as a party defendant and certain testimony regarding the purported reason for the incorporation. It also points to certain differences between the infringing devices and the Dickey-john patents, but does not contest infringement. Lastly, it emphasizes that it obtained an opinion of counsel letter before the date of its first invoice for the infringing devices.

### Patent Validity: The Basic Obviousness Inquiry

■ The ultimate question of the validity of a patent is a question of law. *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 155, 71 S.Ct. 127, 131–32, 95 L.Ed. 162 (1950); *Mahn v.*

---

**3.** Dickey-john also appeals from the denial of post trial motions in which it requested injunctive relief. It states in its brief that it is "uncertain as to whether the District Court simply overlooked the provision for an injunction or was reserving the issuance of an injunction for the final judgment after the trial on damages. Thus, this issue is presented in this Appeal so as to ensure that DICKEY-JOHN's rights are preserved." Br. at 48. In view of the posture of the case at the time of the post trial briefs, we believe the district court was leaving all issues of relief for determination at the second proceeding. We note that Dickey-john does not style the question as a denial of a request for preliminary injunctive relief, Dickey-john's right to seek permanent injunctive relief on remand of this case is hereby preserved. We shall not direct the issuance of an injunction on remand, however, as Dickey-john requests.

*Harwood,* 112 U.S. 354, 358, 5 S.Ct. 174, 176–77, 28 L.Ed. 665 (1884). A patent must satisfy three conditions imposed by the Patent Act of 1952 in order to be declared valid: utility and novelty, under 35 U.S.C. §§ 101 and 102, and nonobviousness under 35 U.S.C. § 103. There is no dispute in the instant case that the patents in issue meet the utility and novelty conditions; the sole contention raised by defendants is that the patents are invalid under § 103.

▋The question of obviousness under § 103 is ultimately a question of law. *Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc.,* 619 F.2d 660, 661, 663 (7th Cir.) (*en banc*), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 490 (1980); *Armour & Co. v. Wilson & Co.,* 274 F.2d 143, 156 (7th Cir.1960) (*en banc*); *see Graham v. John Deere Co.,* 383 U.S. 1, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). Section 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This standard is a codification of the requirement of "invention" long articulated by the Supreme Court in such cases as *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1851) ("[U]nless more ingenuity and skill ... were required ... than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skillful mechanic, not that of the inventor."). *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 279, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976); *Dann v. Johnston,* 425 U.S. 219, 225–26, 96 S.Ct. 1393, 1396–97, 47 L.Ed.2d 692 (1976); *Graham v. John Deere Co., supra,* 383 U.S. at 17, 86 S.Ct. at 693. Judge Learned Hand once observed that the concept of " 'invention' became perhaps the most baffling concept in the whole judicial catalogue of judicial efforts to provide postulates for indefinitely varying occasions." *Lyon v. Bausch & Lomb Optical Co.,* 224 F.2d 530, 536 (2d Cir.1955), *cert. denied,* 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799 (1956). Indeed, courts occasionally have admitted that irrespective of the verbal formula one might enunciate as the governing standard, the ultimate decision regarding the question of invention is largely intuitive. The Supreme Court, wrestling with the problem nearly a century ago, stated this point as follows:

To say that the act of invention is the production of something new and useful does not solve the difficulty of giving an accurate definition, since the question of what is new, as distinguished from that which is a colorable variation of what is old, is usually the very question in issue. To say that it involves an operation of the intellect, is a product of intuition, or of something akin to genius, as distinguished from mere mechanical skill, draws one somewhat nearer to an appreciation of the true distinction, but it does not adequately express the idea. The truth is, the word cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not. In a given case we may be able to say that there is present invention of a very high order. In another we can see that there is lacking that impalpable something which distinguishes invention from simple mechanical skill. Courts, adopting fixed principles as a guide, have by a process of exclusion determined that certain variations in old devices do or do not involve invention; but whether the variation relied upon in a particular case is anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition.

*McClain v. Ortmayer,* 141 U.S. 419, 426–27, 12 S.Ct. 76, 78–79, 35 L.Ed. 800 (1891). Judge Learned Hand, with his typical facility of expression, expressed the idea laconically: "There comes a point when the question must be resolved by a subjective opinion as to what seems an easy step and what does not." *Kirsch Manufacturing Co. v. Gould Mersereau Co.,* 6 F.2d 793, 794 (2d Cir.1925).

Such admissions are, of course, anathema to legal theory, which insists that cases are decided on the basis of an articulated principle and not on the basis of a particular judge's subjective opinion.

■ The Supreme Court has attempted to mitigate the problems inherent in resolving the obviousness question by emphasizing that the question turns on a rigorous analysis rooted in several basic factual inquiries:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims of issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere Co., supra,* 383 U.S. at 17–18, 86 S.Ct. at 693–694. This mode of analysis is an elaboration of the "functional approach" to the obviousness question of the *Hotchkiss* formulation, *see id.* at 12, 86 S.Ct. at 691. Yet, the dispositive step in the obviousness inquiry remains that point where the court determines whether the differences between the prior art and the claims at issue were beyond the level of *ordinary* skill in the art. Attempting to give meaning to the term ordinary has perhaps replaced the quest for a definition of the word invention as the most baffling concept in patent law.

*Secondary Considerations*

Judge Learned Hand, recognizing the pitfalls of a judge venturing into the domain of technology, argued in favor of an empirical approach to the question of invention:

> The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e.g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?

*Reiner v. I. Leon Co.,* 285 F.2d 501, 503–04 (2d Cir.1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). *See also Western States Machine Co. v. S.S. Hepworth Co.,* 147 F.2d 345, 347 (2d Cir.) (L. Hand, J.), *cert. denied,* 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945) ("[I]n judging what requires uncommon ingenuity, the best standard is what common ingenuity has failed for long to contrive under the same incentive.").

Judge Hand's "sign posts" were called "secondary considerations" in *Graham v. John Deere Co., supra,* 383 U.S. at 17, 86 S.Ct. at 693–94, and the label is now literally applied: they are examined only if our own lights fail to produce a firm conclusion that the new assemblage would have been unobvious to one having ordinary skill in the art. Stated another way, only in instances where the obviousness question is a "close" (or doubtful) one are Judge Hand's

sign posts permitted to " 'tip the scales in favor of patentability,' " *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963, 975–76 (7th Cir.1979) (citation omitted), accord *Digitronics Corp. v. New York Racing Association, Inc.,* 553 F.2d 740, 748 (2d Cir.), *cert. denied,* 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977), though relegating these factors to secondary status has been criticized, *e.g. Lee Blacksmith, Inc. v. Lindsay Brothers, Inc.,* 605 F.2d 341, 346–47 (7th Cir.1979) (Pell, J., dissenting).

### The Presumption of Validity

35 U.S.C. § 282 provides that a patent is presumed valid, thus codifying the common law presumption of validity previously enunciated by the Supreme Court, *e.g. Radio Corp. v. Radio Engineering Lab,* 293 U.S. 1, 7, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934) ("A patent regularly issued, and even more obviously a patent issued after a hearing of all the rival claimants, is presumed valid until the presumption has been overcome by convincing evidence of error.").

 Judge (now Justice) Stevens explained that § 282 places the burden of persuasion on the party attacking validity and that burden remains on the alleged infringer irrespective of the prior art considered by the Patent Office; however, in cases where all the prior art was before the Patent Examiner, the burden of overcoming the presumption of validity becomes a more onerous one, and invalidity may only be established by "clear and convincing" evidence. *Chicago Rawhide Manufacturing Co. v. Crane Packing Co.,* 523 F.2d 452, 458 (7th Cir.1975), *cert. denied,* 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976). *See also Ortho Pharmaceutical Corp. v. American Hospital Supply Corp.,* 534 F.2d 89, 93 (7th Cir.1976) (presumption of validity strengthened when Patent Office considered specific prior art urged to show invalidity); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84, 93 (7th Cir.1971) (same strengthened presumption obtains where prior art asserted against validity is no better than that considered by Patent Office). The reason for the stronger presumption in the latter instance—a strengthened presumption which is given effect through the clear and convincing evidence requirement—is that great deference should be accorded to the Patent Office due to its technical expertise. That deference, however, is only as vital as the quality of the prior art considered by the Patent Examiner. Hence, when the alleged infringer demonstrates that non-equivalent, uncited prior art was not considered by the Patent Office, its ultimate judgment is not entitled to deference. Thus we have said that "[e]ven one prior art reference not considered by the Patent Office can suffice to overthrow the presumption." *Henry Manufacturing Co. v. Commercial Filters Corp.,* 489 F.2d 1008, 1013 (7th Cir.1972); *Moore v. Wesbar Corp.,* 701 F.2d 1247 at 1251–1252 (7th Cir.1983); *Pate Co. v. RPS Corp.,* 685 F.2d 1019, 1023 (7th Cir.1982); *Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc.,* 619 F.2d 660, 665 (7th Cir.) (*en banc*), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963, 972 (7th Cir.1979). Even when it is shown that the Patent Office failed to consider non-equivalent prior art, the burden of persuasion still rests on the party attacking the validity of the patent and in that limited sense the patent is still presumed valid; the quantum of proof required to overcome the presumption is merely less stringent. *Deere & Co. v. International Harvester Co.,* 658 F.2d 1137, 1145 (7th Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 514, 70 L.Ed.2d 386 (1981); *see Wolens v. F.W. Woolworth Co.,* 703 F.2d 983 at 992 (7th Cir.1983).

The strength of the presumption of validity which attaches to a patent naturally will affect the degree of doubt we may entertain about whether the subject matter as a whole would have been obvious to one with ordinary skill in the art. We are more likely to harbor doubts about our own assessment of this question when our conclusion is at odds with that of the Patent Office if both its conclusion and ours is based on an analysis of the same, or equivalent, prior art. That does not mean, how-

ever, that in any case in which the clear and convincing standard applies it is appropriate to permit the secondary considerations to tip the scales in favor of patentability. In some cases where that standard applies, we may be convinced in our own minds that the Patent Office was clearly mistaken in its application of the § 103 condition, and that ends the matter. Conversely, even in cases where the clear and convincing standard does not obtain, we may entertain sufficient doubt about the obviousness question to permit examination of the secondary considerations. In such a case, our doubt would not stem from any deference owed to the Patent Office's conclusion on the question, for it would not have decided that question based on the same evidence. Rather, our doubt in such a case would likely stem from the inherent "difficulties in applying the nonobviousness test," *Graham v. John Deere Co., supra*, 383 U.S. at 18, 86 S.Ct. at 694.

### The Fathauer '989 Claims

■ Initially it should be noted that because the Schenkenberg '091 patent constituted prior art to the Fathauer '989 patent, the basic photocell monitor is not claimed in the latter patent in issue. Rather, only three improvements on the photocell monitor are claims in issue here. The district court's factual findings regarding these claims are not in dispute. The first claim is the use of a preamplifier circuit mounted on each seed chute adjacent to the photocell. The preamplifier counteracts interference caused by electrical ignition noise such as that emitted by an engine. With respect to this claim, the problem confronting the would-be inventor was purely a question of electrical engineering. An electric signal was being transmitted from a photocell to a display device over a length of cable which was near a device producing interference. Contrary to Dickey-john's argument, the particular environment in which this problem arose—that is, in a field planter—is not significant to the obviousness inquiry: there is nothing about that environment which would have any special bearing on the narrow electrical engineering problem

at hand. We need not tarry to consider whether this claim is entitled to a presumption of validity, for even if it is presumed valid, the basic electrical engineering handbooks relied upon in part by the district court are clear and convincing evidence that the placement of a preamplifier adjacent to the photocell to counteract electronic ignition noise would have been elementary. The other claims are obvious beyond peradventure: merely consisting of the use of an audible alarm in addition to rows of flashing lights. The audible alarm was a good idea, given the fact that the tractor operator needs to look where he is going, but Dickey-john's argument that prior planter monitors did not have such an alarm renders the alarm nonobvious strains credulity. The designers of the prior mechanical planter monitors were having problems enough just trying to make the monitors monitor reliably; obvious embellishments like the addition of an audible alarm simply were superfluous until success was achieved regarding the basic problem.

### The Fathauer '751 Claims

■ These claims describe circuitry which calculates the distance the planter has traveled while simultaneously counting the number of seeds dispensed. The ratio of these two variables is computed and displayed as a readout of the seed population per unit area of measurement. The counters automatically reset at given intervals to provide successive seed population figures about discrete portions of the field.

Two prior art references cited to the Patent Office are particularly relevant regarding these claims. The first is United States Patent No. 3,422,776 (Gregory '776), which also counted the number of seeds dispensed and contained a method for indicating the distance traversed by the planter (*i.e.* an odometer). When a predetermined distance was traversed, both counters stopped, thus enabling the farmer to manually calculate the ratio of seeds dispensed to distance and hence, ratio of seeds to the acre. United States Patent No. 3,586,835 (Foeh '835) describes an apparatus to measure the rate of

a human heartbeat. The time interval between each pulse is measured and converted to a rate in heartbeats per minute. Prior art not considered by the Patent Office included various general purpose calculating devices manufactured by Hewlett-Packard, and United States Patent No. 3,384,075 (Mitchell '075). The Hewlett-Packard devices count signals conveyed from an external source, store the count in a memory unit until it receives a time or distance signal from an external source, at which point they would display the count in the memory at that point. The display represents a ratio of count to time or distance. The Mitchell '075 patent is another heartbeat monitor, which measures the heartbeat over given time intervals, automatically resetting itself at the predetermined time interval. This uncited prior art rebuts the presumption of validity of these claims; that is, they are significantly more pertinent to the obviousness question than the cited prior art and hence the Patent Office's conclusion on the obviousness question is not entitled to deference. While Dickey-john points to testimony from defendants' expert witness stating that the Hewlett-Packard references were basically the same as the Foeh '835 patent, the district court correctly perceived the significance of the differences between them, *i.e.* that the "Foeh patent . . . discloses an internal or self-generating counter, not a counter which accumulates a count in accordance with input pulses from an external source." Dickey-john can hardly maintain that this difference is inconsequential, since it is this very difference that was argued before the Patent Office to distinguish Foeh '835 from the claims in issue.

These uncited prior art references, in combination with Gregory '776, also serve to meet defendants' remaining burden of persuasion on the question of obviousness. The Hewlett-Packard devices and the Mitchell '075 patent bridge the very gap which was purported to exist between Foeh '835 and the claims in issue: triggering the cessation and resultant display of one count on the basis of a count of electronic signals received from another external source. In addition, Mitchell '075 had the automatic reset feature. Gregory '776 discloses a planter monitor which allows a manual calculation of seed population per unit of area, lacking only the automatic display feature clearly taught by Hewlett-Packard and Mitchell '075.

Once again, Dickey-john relies upon the fact that no prior planter monitor incorporated all of these features. As International Tapetronics correctly points out, that argument merely goes to the novelty of the claims, and does not address the discrete obviousness question. Moreover, the idea that Gregory '776 taught away from any population per area display—a position taken by the Patent Office—is wholly untenable. The fact that Gregory relied upon a manual calculation does not teach *away* from an automatic calculation, it merely does not affirmatively teach in the direction of an automatic calculation. Furthermore, the basic concept of providing an automatic calculation did not require any extraordinary insight—the shortcomings of the manual calculations were manifest. Once the problem was recognized and confronted, the question of how to solve it would have been obvious to one having all the pertinent art before him. Grasping at straws, Dickey-john finally suggests for the first time on appeal that Gregory '776 is somehow irrelevant or less relevant because there is no evidence in the record to show that Gregory '776 was ever commercially produced. First, it is far too late to question the relevance of that patent. Second, lack of evidence in the record on this point does not mean there is no such evidence. Third, it is irrelevant to the obviousness question whether it was commercially produced: its teachings are a matter of public record. Fourth, since the seed counter component of the patent was of the mechanical type which was so unreliable in the field, it would not be surprising that the device was never manufactured in commercial quantities, but that would not in any way call into question the efficacy of the feature of this patent which is relevant to the obviousness determination on the Fathauer '751 claims.

In conclusion of Fathauer '751, we agree with the district court that a hypothetical individual with ordinary skill having all the prior art at hand would have found the same solution as did Fathauer. As we noted regarding the Fathauer '989 claims, the problem was basically one of electrical engineering, and though prior planter monitor art was surely pertinent, there was nothing about the particular field in which the automatic display device had to operate which was significant in finding the solution to the problem. We do not consider the obviousness question on these claims a close one, and hence do not proceed to consider the significance of secondary considerations. We note, however, that Dickey-john makes little attempt at making such showings *specifically* addressed to *these* claims; rather, their evidence on secondary considerations tends to lump all the patents in issue together, which is a problem, as we shall see, in assessing the salience of the secondary considerations regarding the remaining patent in issue, Schenkenberg '091.

### The Schenkenberg '091 Claims

While there are two claims in issue regarding the Schenkenberg '091 patent in this appeal, the parties have failed to treat the claims discretely.[4] Herein lies the reason that the parties are arguing two different cases. Plaintiff maintains that the photocell would not have been obvious to one with ordinary skill in the pertinent arts because of the severity of the contamination problem in the agricultural environment, while defendants' argumentation centers on the obviousness of a capacitor as a solution to dirt problems once a photocell is selected as a counting mechanism. We think both arguments have merit, at least when the claims are analyzed individually.

The first claim of Schenkenberg is the combination of a pair of photocells with a seed planter chute apparatus, in which seeds which pass rapidly through the chute are detected. That is, the interruption of a

beam of light caused by the falling seeds briefly increases resistance causing a momentary voltage to be transmitted. The pulse generating means employed, which signals the passage of the seeds through the chute, responds only to fast moving objects and not to slow light changes. This attribute of the sensor is made possible by the use of a component called a capacitor (or condensor) which is the subject of a second claim. A capacitor has the characteristic of blocking direct current and conveying only an alternating current. The second claim is the use of a capacitor to connect the photocells with the pulse generator circuit.

The district court examined the numerous following prior art references which were cited by the Patent Office. Five prior planter monitors, the first patented in 1959, were considered by the Patent Office, all of which employed a mechanical switch in which a metal tongue protruded in the seed chute and when struck with a falling seed, activated a lightbulb: United States Patent No. 2,907,015; United States Patent No. 2,967,297; United States Patent No. 3,355,-103; United States Patent No. 3,422,776; United States Patent No. 3,527,928. In addition, numerous patented applications of photocells to various counting and sensing problems were also considered by the Patent Office: United States Patent No. 2,269,117 (photocell used to count admission tickets); United States Patent No. 2,540,911 (improvements on ticket counter); United States Patent No. 2,653,309 (optical system which indicates when a pitched baseball is a strike); United States Patent No. 2,854,292 (photoelectric sensing of height of plants in farm implement for thinning and weeding; device placed in front of blades to prevent interference by soil fragments and clippings); United States Patent No. 3,040,980 (photocell used for counting fish while swimming through narrow passageway); United States Patent No. 3,063,596 (photocell used for counting bolts and screws and like small objects); United States Patent

---

4. A third claim, involving the actual monitor display of rows of flashing lights, apparently was also in issue, but neither the district court nor the parties on appeal address this claim. We therefore express no view on the validity of that claim.

No. 3,976,897 (photocell used to sense arrival of vehicle at service station).

The district court also analyzed the following prior art references not cited by the Patent Office which defendants contended were not equivalent to cited prior art and hence rebutted the presumption of validity. First is an article in a British journal by Carlow and Irvine, An Electronic Seed Counter and Group Number Discriminator, Journal of Agricultural Engineering Research (1961). The article discloses a device for testing the dispersal rates and patterns of seed planters in the laboratory. The device consists of a small funnel attached to the planter via a tube and attached through a stopper into a Erlenmeyer flask which in turn has another tube running out of it for purposes of achieving a vacuum in the flask. Attached to the funnel are photocells, and as the seeds are drawn into the flask, passing through the funnel, the seeds are sensed and the rate and pattern of dispersal is analyzed. The block diagram of the associated circuitry shows a capacitor, though the article does not discuss its function.

The next uncited prior art is an article by Pfeifer, Photoelectric Seed Counter, 48 Agronomy Journal 91 (1956). The article describes a seed counter assembly which separates seeds, feeds them one at a time through a channel, and counts the seeds by use of a photocell. Once again, the device is intended for industrial or laboratory use. Once again, the block diagram of the associated circuitry shows a capacitor, but the brief article does not discuss its function.

The third uncited prior art reference is a 1965 publication by McGraw-Hill, Inc. entitled Electronics in Industry. In it is described a paper cutting device which employs a photocell which senses a black dot which is printed periodically on rolls of paper: when the black dot is sensed, the machine is instructed to cut the paper at that point. The block diagram shows that the associated circuitry contains a capacitor. Moreover, the article explains the purpose of the capacitor: "(Without such capacitor coupling, the circuit responds not only to the dark spot on the paper but also to any gradual change in the light reflected from the rest of the paper. This highspeed relay will give more positive or definite action if its circuit responds only to sudden changes of light, so it is not affected by slow light changes caused by dirt gathering on the lens or phototube or by the use of a roll of darker paper.)" *Id.* at 425.

The district court found that the uncited prior art references were equivalent to prior art cited by the Patent Office. Such a finding is ordinarily subject to the clearly erroneous standard of review. *Lee Blacksmith, Inc. v. Lindsay Brothers, Inc.,* 605 F.2d 341, 343 (7th Cir.1979). An exception to this rule exists where the finding is based solely on a comparison of the documentary evidence uninformed by testimony; in such a case, we may review the finding as a de novo matter. *See LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84, 87 (7th Cir.1971). In this case, since the district court relied in part on expert testimony in judging the comparative relevance of the uncited prior art, the clearly erroneous standard obtains, as defendants tacitly concede. *Reese v. Elkhart Welding and Boiler Works, Inc.,* 447 F.2d 517, 520 (7th Cir.1971).

Defendants urge that Carlow and Irvine and Pfeifer are not equivalent to cited prior art because they employ photocells for the counting of seeds while none of the cited prior art references employing photocells involved seed counting. But that uncited art is no better than that before the Patent Office, which taught the use of a photocell to count any number of small items as they passed through a channel. Carlow and Irvine and Pfeifer, as the district court observed, involved counting in a controlled environment. In view of all the prior art before the Patent Office, the use of a photocell to count seeds or any other small solid objects in such controlled environments was obvious, and that which is obvious in light of the cited prior art is equivalent to the prior art for purposes of analyzing the presumption of validity. While defendants point to language in the file wrapper in

which Schenkenberg argued that previous art did not disclose a photoelectric seed counter, it appears that Schenkenberg was emphasizing, as he had throughout the patent prosecution, that no prior *planter* monitor had employed a photocell. Moreover, it must be remembered that in the prosecution of a patent, the applicant is not only attempting to demonstrate the nonobviousness of his claims, but also their utility and novelty. To the extent that Schenkenberg did emphasize that the prior art did not disclose a seed counter employing a photocell, a novelty question is implicated. Now it is true that novelty and nonobviousness are separate conditions of patentability, but it is also true that there exists some analytical overlap. That which is anticipated, and hence not novel, is necessarily obvious, though the converse is not true. *Popeil Brothers, Inc. v. Schick Electric, Inc.,* 494 F.2d 162, 167 (7th Cir.1974). *See generally, Research Corp. v. Nasco Industries, Inc.,* 501 F.2d 358, 360 (7th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 689, 42 L.Ed.2d 688 (1974). In the patent prosecution, this analytical overlap is magnified, and the applicant cannot be quite certain about the precise nature of potential objections to the patentability of his claims and hence attempts to address all possible objections, even where the Patent Office's stated concern is the obviousness question.

The McGraw-Hill prior art presents a closer question. The district court considered this equivalent prior art for two reasons: first, on the basis of testimony from defendants' expert witness that the circuitry in the McGraw-Hill device was basically identical to circuitry described in a patent (Hausz) which was cited, and second, on the ground that the device was intended for use in a factory setting.

Defendants point out that the McGraw-Hill reference, unlike Hausz, expressly explains the purpose of the capacitor. We agree with defendants that this art is more pertinent than the cited art, which like Carlow and Irvine and Pfeifer, showed the combination of a photocell and a capacitor but did not teach the purpose of the capacitor. Not only does this non-equivalent prior art reference have the effect of rebutting the presumption of validity of the Schenkenberg patent, but further, in conjunction with the other prior art, this teaching in the McGraw-Hill reference is sufficient to carry defendants' burden of persuasion with respect to claim 2 of the patent, which merely claims the use of a capacitor to couple the photocell with the monitor display. One thing appears clear under the teachings of the prior art: *if* one were to employ a photocell for counting purposes in a dirty environment, the interposition of a capacitor to block the direct current (such as that caused by accumulation of dirt on the lenses) and convey only an alternating current (such as that caused by a rapid interruption in the light source) would be an obvious element of the system. Even photocells used in relatively clean environments contained this feature, and its function was seemingly so elementary that Hausz (not to mention Carlow and Irvine, and Pfeifer) did not remark about its function, for it was entirely unremarkable. Moreover, while it may be splitting grammatical hairs, we think it not without significance that the McGraw-Hill reference, which explicitly noted the reason for the presence of the capacitor in the circuitry, did so as an aside, in parentheses. The point is that a capacitor is apparently routinely used in conjunction with a photocell (at least where the photocell is used to sense rapidly moving objects) to counteract the universal problem which a photocell would encounter as dust—an ever present substance in all but the most unusual environments—would accumulate on the lenses. Schenkenberg did not discover this feature of the capacitor; it merely capitalizes on it.

Thus claim 2 of Schenkenberg, which claims a patent on the use of a capacitor as a connector between a photocell and a pulse generating circuit, is invalid for obviousness. This claim suffers from the same basic defect as the claim for the preamplifier in Fathauer '989. Once a photocell was selected as the sensing device in a field planter, the *solution* to the problem confronting the would-be inventor regarding

the limitations of a photocell would be found, if anywhere, in the electronics art. In light of the prior art in that field, it would have been nothing short of unorthodox not to use a capacitor to connect the photocell to the pulse generating circuit, given both the nature of the counting task at hand and the dirty environment in which it had to operate. In this latter respect, prior planter monitor art was of course relevant insofar as it taught the problem of contaminants collecting in the seed chutes, but with respect to claim 2, this factor naturally and obviously taught in favor of the capacitor connection, not away from it.

The district court did not discretely analyze claim 2, though it held the claim valid. Given the parties' approach to Schenkenberg, this error was understandable, but it was error nonetheless, and hence the district court's judgment declaring claim 2 valid will be reversed.

The question remains, however, whether claim 1 would have been obvious to one with ordinary skill in both relevant arts. The uncited McGraw-Hill reference rebuts the full presumption of validity with respect to this claim because in judging whether the combination of a photocell with a planter apparatus would have been obvious, the McGraw-Hill reference is significantly more relevant than the cited prior art. The ultimate burden of persuasion regarding the invalidity of this claim still rests with defendants, and notwithstanding defendants' arguments to the contrary, McGraw-Hill is not dispositive on this question, and defendants have failed to persuade us of the claim's invalidity.

It should be emphasized that the problem confronting the would-be inventor regarding claim 1 is a quite different one than that we have just analyzed. The problem to be confronted regarding claim 2 was how to design a photocell circuit which would not respond to gradual changes in light caused by the slow accumulation of dirt on the lenses. The problem confronting Schenkenberg, and others like him at the time, was a broader one—a significantly broader one: how to devise a workable seed planter monitor.[5]

---

**5.** We note that it is often said that a new use for an old device is not invention, *e.g. General Electric Co. v. Jewel Incandescent Lamp Co.,* 326 U.S. 242, 247–49, 66 S.Ct. 81, 83–84, 90 L.Ed. 43 (1945); *Roberts v. Ryer,* 91 U.S. 150, 157, 159, 23 L.Ed. 267 (1875); *Brown v. Piper,* 91 U.S. 37, 41, 23 L.Ed. 200 (1875); *see generally* 1 D. Chisum, Patents § 1.03[8] (1982); just as it is correlatively said that combination patents should be scrutinized with care due to the unlikelihood of finding invention in the combination of old elements, *e.g. Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976); *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). While we take heed of these admonitions, they are more valuable as general explanations of doctrine rather than rules of law which provide concrete assistance in grappling with specific cases. The question regarding obviousness turns on whether the new adaptation of an old device would have been obvious to one with ordinary skill in the pertinent art, or stated another way, whether the combination of old elements (which are concededly individually performing the only function that they ever could perform, *e.g. Safety Car Heating & Lighting Co. v. General Electric Co.,* 155 F.2d 937, 939 (2d Cir.1946) (L. Hand, J.); *accord Nickola v. Peterson,* 580 F.2d 898, 912 n. 22 (6th Cir.1978), *cert. denied,* 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1979) ("an electrical capacitor must exhibit capacitance")) would have been obvious to one with ordinary skill in the art, *e.g. Application of Warner,* 379 F.2d 1011, 1016 (Cust. & Pat.App.1967), *cert. denied,* 389 U.S. 1057, 88 S.Ct. 811, 19 L.Ed.2d 857 (1968) ("[W]here the invention sought to be patented resides in a combination of old elements, the proper inquiry is whether bringing them together was obvious and not, whether one of ordinary skill, having the invention before him, would find it obvious through hindsight to reconstruct the invention from elements of the prior art."); *B.G. Corp. v. Walter Kidde & Co.,* 79 F.2d 20, 22 (2d Cir.1935) (L. Hand, J.) (noting all inventions are combinations of old elements, and that the selection of a given combination "which proves serviceable to a given need may require a high degree of originality. It is that act of selection which is the 'invention' and it must be beyond the capacity of commonplace imagination."); *see also, Potts v. Creager,* 155 U.S. 597, 606–08, 15 S.Ct. 194, 198–199, 39 L.Ed. 275 (1895); *see generally, Research Corp. v. Nasco Industries, Inc.,* 501 F.2d 358, 360 (7th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 689, 42 L.Ed.2d 688 (1974); 35 U.S.C. § 100(b) (a "new use of a known process" is patentable).

We now turn to defendants' attempts to persuade us that the combination of a photocell with a planter apparatus would have been obvious to one skilled in the pertinent arts. Defendants first argue that the district court erred in considering only prior planter monitor art regarding the basic Schenkenberg claim. Manifestly, the district court did no such thing, but considered both the planter monitor art and general electronics art.[6] Defendants, on the other hand, make the very error which they mistakenly attribute to the district court. They do not accord any weight whatsoever to the expertise of those in the planter monitor art and instead view only the electronics art as relevant, though they do not and cannot attack the district court's finding that both arts are pertinent. The planter monitor artisans were plagued by a severe environmental contamination problem which hampered the functioning of previous planter monitors. Defendants either ignore those problems, or discount their salience through the luxury of hindsight. The testimony of defendants' expert witness typifies this basic shortcoming in defendants' argument.

Defendants' expert witness, a professor of electrical engineering, while acknowledging that the decision about whether to attempt to use a photocell as an alternative to a mechanical switch would be "dependent upon the particular things you're trying to count *and* the conditions under which you're going to count them," (emphasis added), admitted that he had made no investigation of the environmental conditions in which a planter monitor would have to operate. He specifically admitted that he was not familiar with the problem of graphite and pesticides (with which the seeds are treated prior to planting) coating the seed chute. Moreover, under questioning from plaintiff's counsel, he admitted that a person who had never made an investigation of the conditions under which the planter monitor would have to operate would be unable to determine whether a photocell would work there, and said he "didn't know" if a person who had made such an investigation would conclude that a photocell would not work in that environment. Nonetheless, after being informed that a "dirt" problem existed, he was quite willing to offer his opinion about the obviousness of using a photocell.

Defendants' expert's testimony regarding this question is a textbook example of hindsight. After being shown the McGraw-Hill prior art and being told by counsel about the dirt problem in general terms, he was asked whether it would have been obvious that a photocell would have worked notwithstanding the dirt problem. He responded initially: "I believe that would be one of the first things one would try. I—I think that was—that would just be kind of natural because if you could overcome the dirt problem, you have almost an ideal

---

**6.** One might question whether attributing to the hypothetical artisan on this claim an exhaustive knowledge of the electronics art is appropriate. Our hypothetical friend needs to be somewhat eclectic, but not the proverbial renaissance man. *See Saunders v. Air-Flo Co.,* 646 F.2d 1201, 1207 (7th Cir.1981) (regarding patent for air baffle to reduce wind drag on truck, hypothetical artisan deemed expert in truck design but not in aerodynamics); *Copeman Laboratories Co. v. General Plastics Corp.,* 149 F.2d 962, 964 (7th Cir.1945) (regarding patent on flexible plastic ice cube trays, pertinent art that of making ice cube trays, plastic trays for forming chocolate candies deemed non-analogous art); *but see, e.g., Geo. J. Meyer Manufacturing Co. v. San Marino Electronic Corp.,* 422 F.2d 1285 (9th Cir.1970) (pertinent art includes accumulated art in general fields commonly applied to solve similar problems in related fields); *Weather Engineering Corp. v.*

*United States,* 614 F.2d 281 (Ct.Cl.1980) (discussing same cross-fertilization principle). We have long recognized that the "prior art that is relevant in evaluating a claim of obviousness is defined by the nature of the problem confronting the would-be inventor." *Louis A. Grant, Inc. v. Keibler Industries, Inc.,* 541 F.2d 284, 291 (7th Cir.1976). In applying this standard, however, the danger exists that the prior art will be expanded to be defined by the *solution* found by the would-be inventor. This danger, merely a specific instance of the application of hindsight, may exist in this case and be the cause of the parties differing approaches to it. Arguably implicit in the determination that the prior photocell art is relevant is a determination that it would be obvious to employ a photocell in a planter; yet the photocell was the *solution* to the problem, not the problem itself, and the entire question is whether that solution would have been obvious.

counting mechanism because it's not going to disturb the seed dropping down the tube...." Notwithstanding the fact that mechanical switches had been the sole avenue of research in the field for many years, after defendants' counsel discussed with his expert the fact that actual artisans in the planter monitor field did not pursue the photocell because of the dirt problem, the more the expert thought about the use of a photocell the more obvious it became to him. By that point, he concluded: "My thought is that [the photocell] would be the first thing I would try, and I would expect my students to try."

Thus on the basis of a general, second-hand description of the problem—counting seeds in a "dirty" environment—and on the basis of a general teaching that a photocell when used in conjunction with a capacitor would not respond to the gradual buildup of dust on a photocell's lenses, the defendants' expert was quite willing to say the use of the photocell was obvious. But that method of analyzing the question generalizes the problem and the solution out of the domain of reality and into the realm of the abstract, illustrated by defendants' counsel's fondness for saying that "dirt is dirt." To those in the planter monitor field, the "dirt" problem was no mere abstraction—it was a tangible, visible, and quantifiable reality.[7] They knew from first-hand experience the degree to which dirt, moisture, graphite, and pesticides coated the linings of the seed chutes and had interfered with the functioning of the mechanical monitors. This was no hypothetical concern; it was something you could scrape off and rub between your fingers. Defendants' expert was in no position to tell those artisans that a photocell was the first thing they should have tried; he was in no position to say that it would have been tried at all by one with ordinary skill in the art.

Knowing that the photocell actually works in the dirty agricultural environment, defendants' expert can tell us why it works—because of the capacitor. That does not tell us that the combination of the photocell with the planter would have been obvious to our hypothetical friend having all the prior art at hand; it merely tells us that upon being informed of the combination's functional success, a skilled individual can tell why the combination is successful.

The prior art no doubt taught the use of a capacitor to counteract the problem of the photocell responding to gradual rather than sudden changes in light, the kind of gradual change which would occur from dust accumulating on the lenses of the photocell. The problem with the use of the photocell in the field of the farmer was the severity of the dirt and moisture problem. Admittedly, this is a difference in degree. The prior art taught a capacitor would counteract a minor gradual accumulation of dust problem, whereas a major problem in this regard existed with respect to planter monitors, as the prior planter monitor art clearly disclosed. In a very real sense, it was not, however, merely prior art which taught away from using the photocell in a planter monitor, but rather, common sense. Often common sense is the most potent barrier to innovation and it takes uncommon ingenuity to disregard it. In the words of plain-

---

**7.** This knowledge of the planter monitor artisans is clearly part of the relevant prior art. *Mooney v. Brunswick Corp.*, 663 F.2d 724, 733 (7th Cir.1981) ("The prior art includes any relevant knowledge, act, descriptions and patents which pertain to, but pre-date, the invention in question.") That does not mean, of course, that the artisan's conclusion that the photocell would not work is part of the level of ordinary skill in the pertinent art, for if that were true, the question of obviousness would be a foregone conclusion, totally subsumed in the factual determination of the level of ordinary skill in the art. Such subjective skepticism of experts is properly relegated to secondary considera-

tion status. *Control Components, Inc. v. Valtek*, 609 F.2d 763, 766 (5th Cir.), *cert. denied*, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). The practical knowledge of artisans working in the field, however, which would objectively teach away from the invention is not relegated to secondary status, but rather is part of the prior art and analyzed in conjunction with the other basic factual inquiries. *See Brunswick Corp. v. Champion Spark Plug Co.*, *supra*, 689 F.2d 740 at 749–752. *See generally Nickola v. Peterson*, 580 F.2d 898, 913 (6th Cir.1978), *cert. denied*, 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1979).

tiff's expert witness, who considered but abandoned the idea of adapting a photocell for planter monitor use, the dirt problem was simply considered "too severe" to make that avenue of experimentation worthwhile. He was wrong, of course, as we now know. The problem was not too severe. We think that one with ordinary skill in the art would have regarded it as too severe, and hence would have continued, as did plaintiff's expert, to tinker with the mechanical monitor in order to solve the problem. *See United States v. Adams,* 383 U.S. 39, 52–53, 86 S.Ct. 708, 714–715, 15 L.Ed.2d 572 (1966); *Santa Fe-Pomeroy, Inc. v. P & Z Co.,* 569 F.2d 1084, 1097 (9th Cir.1978); *see generally, John Zink v. National Airoil Burner Co.,* 613 F.2d 547, 551 (5th Cir.1980); *Amax Fly Ash Corp. v. United States,* 514 F.2d 1041, 1044–45 (Ct.Cl.1975); *Ingersoll-Rand Co. v. Brunner & Lay, Inc.,* 474 F.2d 491, 497 (5th Cir.), *cert. denied,* 414 U.S. 865, 94 S.Ct. 125, 38 L.Ed.2d 117 (1973).[8] At the least, this renders the obviousness question a close one, and hence we proceed to examine the secondary considerations.

We first recognize the limited probative value of those factors on the discrete question of obviousness. One set of secondary considerations relates to the pre-patent in issue time frame. If the patent in issue filled a need that was not only genuine, but long felt—that is, long *consciously* recognized—the inference is that for a long period of time actual artisans were attempting to solve the problem. The greater the need, and the longer it was felt, the stronger the inference. Actual documented failures of others enhance the inference that the patent in issue is a "new display of ingenuity beyond the compass of the routineer...." *Kirsch Manufacturing Co. v. Gould Mersereau Co.,* 6 F.2d 793, 794 (2d Cir.1925). The proposition, however, that the ordinary mechanic's failure to solve a long-felt problem may be relied upon safely as the measure of obviousness is as seductive as it is flawed. Our hypothetical friend, unlike the ordinary

artisan, has knowledge of *all* the pertinent prior art which would assist him in solving the problem. Thus the fact that those with ordinary—and indeed, extraordinary—skills failed for a time in finding the solution may be attributable to the simple fact that they failed to take advantage of the massive body of knowledge already in the public domain. And the more massive that body of knowledge becomes, the more common this explanation of failure becomes. Still, the more compelling the inference of the secondary considerations becomes, that is, the more significant the need, the longer it was felt, then the greater the likelihood that at least some of those actually laboring in the field tracked down all the pertinent prior art and still failed to perceive the solution that the patent discloses. But even in cases where these considerations seem their most compelling, if the advancement disclosed by the patent seems intuitively obvious in light of the prior art, the tendency is to explain the failure of others on the basis of incomplete knowledge of the prior art, or find the premise that many artisans were actually diligently working to find a solution implausible.

The other set of secondary considerations relates to the commercial success of the patent. Commercial success, standing alone, has nothing whatever to do with the obviousness question. A product is not a commercial success because it required an extraordinary insight to develop it. People do not buy a product because an ordinary mechanic could not have developed it. The most inventive patent imaginable may be an abysmal commercial failure, and the most obvious patent may be a tremendous commercial success. Commercial success, of course, turns on the first two conditions of patentability: utility and novelty, and of course other factors such as advertising and marketing skills.

It is the foreseeability of commercial success at that point in time before the prob-

---

**8.** In this regard, we note that the question of whether it would have been obvious to the ordinary artisan to try the combination and the question of whether the combination would have been obvious to the ordinary artisan are one and the same. *Mooney v. Brunswick Corp.,* 663 F.2d 724, 736 (7th Cir.1981).

lem is solved which is relevant to the obviousness determination. If individuals believe there is "a fortune waiting in the wings" for the person who solves the problem, we infer that with such an incentive, many artisans were actually attempting to find the solution. The longer they failed to do so, the stronger the inference that it took extraordinary skill to solve the problem.

In the final analysis, however, it may well be that at some point in the decisional process the neat doctrinal categories of utility, novelty, and obviousness merge and a particularly useful and novel device will be given the benefit of the doubt on a close obviousness question. It seems apparent that the secondary considerations are either restatements of or logical and inexorable corollaries to the first two conditions of patentability: it is axiomatic that a device which is both new and useful fills an unfilled need which previously existed, and depending upon the strength of these factors—that is, depending upon how new and how useful the device is—the device will meet with a proportionate degree of commercial success. In other words, the so-called secondary considerations are not secondary at all to the *ultimate* question of patent validity—they are primary conditions precedent to patent validity; but they are *secondary* considerations to the question of obviousness. That must be the case, unless the last one hundred and fifty years of patent doctrine is fundamentally flawed. In the early years of patent law, it must be remembered, the only two conditions of patentability were utility and novelty. *E.g., Graham v. John Deere Co., supra,* 383 U.S. at 9–14, 86 S.Ct. at 689–692. For years, under that doctrine, the cases turned basically on the question of whether the purported invention was new and useful *enough* to warrant the reward of a patent. The great turning point in patent law came when it was recognized that utility and novelty alone did not a patent make. Something more was required, at times called a "flash of genius," at times called "invention," but all getting at the idea that an "impalpable something" more was re-

quired to obtain a patent than a new and useful idea. As is so often true in the law, however, the old rule continued to rule from its grave, but only in certain cases— cases in which the new rule did not work— and by a different name—secondary considerations. Moreover, the old rule has been rationalized in terms of the new rule, otherwise it would have to be admitted that the new rule had failed. It is thus said that the secondary considerations are part and parcel of the new rule—that long felt need and commercial success can tell us whether or not something should have been obvious to one with ordinary skill, when in truth, they bear only remotely on that discrete question. Hence, we now say that in a "close" case—that is, in a case where the new rule has failed—we may look to secondary considerations. In short, in cases where obviousness is in doubt, our doubts about the ultimate question of validity may be resolved if the other factors relevant to that question are particularly compelling.

In the instant case, the district court found, and defendants do not dispute, that there was a long-felt need for a reliable, accurate seed planter monitor. The undisputed testimony indicates that all prior attempts at developing a monitor had failed. Virtually contemporaneously with the filing of the Schenkenberg patent application, an electronics firm hired by Dickey-john to develop a seed planter monitor viewed the use of a photocell as a sensing device manifestly unworkable due to the severity of the contamination problem which had plagued the mechanical monitors. Finally, when the photoelectric monitor appeared in the market, it was a great commercial success and quickly supplanted the planter monitor field. These factors, taken together, in our view tip the scales in favor of patentability in this case. In this regard, we think it highly significant that the Schenkenberg monitor was not merely a moderate improvement over the prior planter monitor art, but rather, it succeeded in achieving a quite important result where the prior art was essentially a practical failure. While this factor goes not so much to the discrete

348

question of obviousness, it is important regarding the ultimate question of patentability: whether the inventor has made a "contribution to the public which the law deems worthy of recompense." *Gorham Co. v. White,* 81 U.S. 511, 525, 14 Wall. 511, 525, 20 L.Ed. 731 (1871).[9]

We do note, however, that part of the commercial success of the Dickey-john monitors may be due to the Fathauer claims which have been held invalid for obviousness. The sales figures indicate a larger than previously experienced increase in sales at about the time the Dickey-john monitors began incorporating the obvious improvements of the Fathauer claims. This fact does not, standing alone, indicate that the Fathauer claims are nonobvious; nor does it alter our conclusion that secondary considerations support a holding of patentability regarding the Schenkenberg patent. Rather, it does have bearing on the amount of defendants' liability. This question, however, is best left to the further district court proceedings on damages which will occur on remand.

### Willful and Wanton Infringement

While the obviousness question regarding the Schenkenberg patent in this case is a close one, defendants can take no comfort in that fact regarding the infringement issue. In cases where close questions are presented regarding the infringement issue, obviously a finding of willful and wanton infringement is ordinarily inappropriate and hence an award of treble damages is inappropriate. *See Deere & Co. v. International Harvester Co., supra,* 658 F.2d at 1146. In this case, however, defendants clearly infringed, and the only question regarding their good faith was whether at the time of the infringement they had a good faith belief in the invalidity of the patent. As the district court found, their contemporaneous actions belie any indication of good faith. They will not be permitted to be saved from their flagrant disregard for the patent laws by the fortuity that when the patent in issue was closely scrutinized in this lawsuit, a close question of obviousness was presented. A different question would present itself if defendants had a genuine good faith belief in the invalidity of the patent at the planning stages of the infringing device. *See id.* at 1147. Obtaining a conclusory opinion of counsel letter after the manufacture of the infringing device and after a notice of infringement has been received from the patentee does not indicate good faith. The opinion of counsel letter from which defendants attempt to derive support is simply too little too late. It is exceedingly conclusory—merely concluding that "defendants' devices do not infringe any valid claim" of the Dickey-john patents—and obviously obtained as an afterthought and in a hurry in order to predate (and just barely) the first invoice on an infringing monitor.

9. Defendants devote a substantial amount of argumentation to the proposition that patents are limited to "discoveries." While that proposition is undoubtedly true, such generalities do not aid our analysis of particular cases. Often if one attempts to state in general terms precisely what it is that a patentee has "discovered," the invention appears obvious because few inventions really establish a startling new scientific principle, and all inventions that work can be explained in terms of basic truths. Thus in *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.,* 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944) concerning a patent on a leak-proof battery, the dissent complained that all the patentee "discovered" was that the creamy substance in a dry cell would not leak through a securely fastened steel jacket, but that the "discovery" that liquids will not leak through leak-proof solids had been made by the an-

cients. *Id.* at 280, 64 S.Ct. at 595. The majority found the new and useful product worthy of patent protection. We think this demonstrates the danger of generalizing the discovery into abstraction, and then reasoning that since the abstract scientific principle at work in the specific case is well known, the patentee had made no discovery. Yet patent law has never been the domain of the abstract—one cannot patent the very discoveries which make the greatest contributions to human knowledge, such as Einstein's discovery of the photoelectric effect, nor has it ever been considered that the lure of commercial reward provided by a patent was needed to encourage such contributions. Patent law's domain has always been the application of the great discoveries of the human intellect to the mundane problems of everyday existence.

Creating a shell subsidiary to market the device within two weeks of receiving a notice of infringement indicates bad faith, as the district court correctly held. While International Tapetronics argues that it never attempted in this litigation to shield itself from liability through use of its minimally capitalized wholly-owned subsidiary created for the purpose of marketing the infringing devices, that says nothing about its intent at the time the corporation was created. Had International Tapetronics forwarded such an argument, it might have been evidence of bad faith in the conduct of the litigation warranting an award of attorney fees under 35 U.S.C. § 285. *See generally Allen v. W.H. Brady Co.,* 508 F.2d 64, 67 (7th Cir.1974). While there has been a tendency in our cases to lump together the questions of willful and wanton infringement under 35 U.S.C. § 284 and bad faith in litigation under 35 U.S.C. § 285, *see, e.g., Wahl v. Carrier Manufacturing Co.,* 511 F.2d 209, 214 (7th Cir.1975), the issues are discrete to the extent they are concerned with different time frames, and the fact that defendants may have litigated the case in good faith does not establish their good faith in developing and marketing the infringing device. Lastly, International Tapetronics points to testimony that the reason for creating the subsidiary was merely for bookkeeping convenience. The district court did not credit that testimony, however, and instead viewed the timing of the creation of the shell subsidiary as the best indication of International Tapetronics' intent. Its judgment on this matter will not be disturbed.

*Conclusion*

Accordingly, in No. 81–2085 we affirm, in No. 81–2022 we reverse the judgment insofar as it found claim 2 of the Schenkenberg '091 patent valid and infringed, and in other respects we affirm regarding all issues litigated in this appeal. Costs in No. 81–2085 are awarded to appellees. The parties shall bear their own costs in No. 81–

2022. This cause is hereby remanded for further proceedings.

SHADUR, District Judge, concurring in part and dissenting in part.

Because the majority opinion contains such a felicitous exposition of the principles that apply to our required determination of obviousness, it is easy to differentiate between the holdings (and the rationale) with which I concur and the one important holding from which I must dissent. There is no difference among us as to the invalidity of Fathauer '989 or Fathauer '751. Indeed our differences are materially lessened from those I had earlier thought to exist, for the majority now agrees that claim 2 of Schenkenberg '091 is invalid as well. It therefore remains only to consider Schenkenberg's claim 1, which I would also find invalid on obviousness grounds—and for much the same reasons that have persuaded all of us on claim 2.[1]

Among the many unexceptionable aspects of the majority opinion is its succinct explanation at slip op. 5 of the district court's premises (with which I gather all of us concur):

> Neither party disputes the district court's finding that both the planter monitor art and the electronics art are relevant to the obviousness inquiry. The court also found the level of ordinary skill in the planter art to be relatively unsophisticated, while the level of ordinary skill in the electronics art to be sophisticated.

When Schenkenberg and Fathauer did their work, "ordinary skill" (the standard of Section 103) was unquestionably much higher in the electronics field than the crude level that planter monitoring had reached.

This to me carries the necessary implication that the perspective from which Schenkenberg's claimed invention must be viewed is that of a person knowledgeable in the art of electronics, who is then informed about the specific problem to be addressed in the planter monitoring area, and not that of a person knowledgeable about planters

---

1. Because of this dissent as to claim 1, I take no position on the issue of willful and wanton infringement discussed at the end of the majority opinion.

**350**

who must then be educated to the requisite level of skill in electronics.[2] Nor is that merely a semantic difference, for the majority's accurate statement (and therefore legally accurate resolution) of the problem as to claim 2 gives way to an inaccurate (only because it is incomplete) statement of the problem as to claim 1 (at 343):

> The problem confronting Schenkenberg, and others like him at the time, was a broader one—a significantly broader one: how to devise a workable seed planter monitor.

If we hypothesize a person of ordinary skill in the electronics art [3]—and that means all its ordinary phases and manifestations [4]—to whom the planter monitoring problem were posed, the *most* obvious potential solution would have been a photoelectric cell circuit. Indeed even Dickey-john's plainly non-expert "expert" Marsh, an electrical engineer, reacted in *exactly* that way when the problem was put to him (Dickey-john App. 157):

> Q. How much time did you spend investigating the photoelectric principle?
>
> A. It would be an outright guess, but in the beginning that's the way I thought inherently, you know, we ought to try to go; and they, I guess, the people I was talking to at that time, indicated that any amount of dirt would, you know, just change the sensitivity so badly that you wouldn't be able to detect it. So I'd say a week. I don't know.

2. This is so because it obviously takes much more extensive teaching to raise someone to the level of ordinary skill in a highly sophisticated art.

3. It may be that my own antediluvian (or at least pre-law and pre-World War II) degree in mathematics and physics, coupled with the war years spent in exploring the arcane mysteries of the then-primitive art of airborne radar, would have—had I pursued that path rather than the law—skewed my perception of "ordinary skill" in electronics. But at this stage, scarcely able to tune in a TV set, I surely do not possess anything remotely resembling current "ordinary skill." Yet with my less than ordinary skill in the electronics art, I found immediately obvious both the capacitor solution

In other words, Marsh's intuitive and sensible response to the problem was to think of the photoelectric cell as the *solution.* All that kept him from pursuing that solution was his ignorance of what all of us on this Court have found obvious: that the customary inclusion of a capacitor in the photoelectric-cell circuit would likely solve what he and the people he was talking to thought an insoluble problem—the dirty environment. And had he (or anyone with ordinary skill in the art) *tried* that solution instead of abandoning the concept at the outset, he would have found it was indeed *the* solution.

For that purpose the McGraw-Hill prior art is compelling on the issue of obviousness, not only as to claim 2 as the majority agrees (see at 342–343) but also as to claim 1. As the majority itself quotes (*id.* at 341), McGraw-Hill teaches what everyone with a modicum of skill in the electronics art knows about a wholly *conventional* type of photocell circuit (one containing a capacitor):

> Without such capacitor coupling, the circuit responds not only to the dark spot on the paper but also to any gradual change in the light reflected from the rest of the paper. This high-speed relay will give more positive or definite action if its circuit responds only to sudden changes of light, so it is not affected by slow light changes caused by dirt gathering on the lens or phototube or by the use of a roll of darker paper.

(which the majority now agrees was obvious) and the photoelectric cell solution (which the majority does not find obvious). As the text discussion next reflects, *both* parties' experts found the photoelectric cell the first and most obvious solution to explore.

4. This proposition is stated specifically to confirm the absence of any disagreement with what seems to be a straw man in the majority's n. 6:

> One might question whether attributing to the hypothetical artisan on this claim an exhaustive knowledge of the electronics art is appropriate. Our hypothetical friend needs to be somewhat eclectic, but not the proverbial Renaissance man.

It was the predecessor of the new Court of Appeals for the Federal Circuit that authored the charming conception of the prospective inventor surrounded by the prior art, *In re Winslow*, 365 F.2d 1017, 1020 (Cust. & Pat.App.1966):

> We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references— which he is presumed to know—hanging on the walls around him.

Had Marsh not been blinded by the second-hand preconceptions (and misconceptions) of persons who had knowledge in the *planter* art, but none in the *electronics* art—had the problem been addressed by anyone with really ordinary skill in the sophisticated art of electronics (and that means someone charged with constructive notice of the McGraw-Hill teaching)—the photocell solution would have been wholly obvious to him.

We should not permit ourselves to be diverted by what Marsh, through lack of real knowledge in the field in which he purported to be expert—electronics—permitted to snow him and to divert him from even *trying* the photoelectric cell. What dissuaded him from the obvious attempt to try what would have proved the real solution was his lack of understanding that the capacitor (an obvious component of the photoelectric-cell circuit) would do the job. Let us accept the majority on its own terms as stated at the end of its n. 6:

> Arguably implicit in the determination that the prior photocell art is relevant is a determination that it would be obvious to employ a photocell in a planter; yet the photocell was the *solution* to the problem, not the problem itself, and the entire question is whether that solution would have been obvious.

Dickey-john's *own* electronics man (and not just the expert witness for International Tapetronics, who is chided for second-guessing) acknowledged that the photocell *was* the obvious solution to be tried. And under the view the majority and I share, a photocell solution means a photocell-plus-capacitor circuit.

For that reason I believe the majority has led itself into error by the artificial division of a non-divisible problem. Its correct conclusion that Schenkenberg's claim 2 is invalid cannot fairly be reconciled with its determination that claim 1 is valid. It therefore becomes inappropriate in my view to address the secondary considerations (which as the majority agrees have "limited probative value ... on the discrete question of obviousness"). Accordingly I dissent from Judge Eschbach's thoughtful and able exposition only as to Schenkenberg's claim 1, which should be invalidated along with claim 2.